# IN THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES | CRIMINAL ACTION |
| v. | |
| KENNETH SMUKLER | NO. 17-563-02 |

J. DuBois                                                                                                     April 9, 2018

## M E M O R A N D U M

### I. INTRODUCTION

On October 24, 2017, a federal grand jury in the Eastern District of Pennsylvania named defendant Kenneth Smukler and co-defendant Donald "D.A." Jones in a six count indictment.[1] The Indictment charges Smukler with participation in a conspiracy in violation of 18 U.S.C. § 371 (Count I), causing unlawful campaign contributions in violation of 52 U.S.C. §§ 30109(d)(1)(A)(i), 30116(f), and 18 U.S.C. § 2 (Count II), causing false campaign expenditure reports in violation of 52 U.S.C. §§ 30104(a)(1), 30104(b)(5)(A), 30109(d)(1)(A)(i), and 18 U.S.C. § 2 (Counts III and IV), and causing false statements in violation of 18 U.S.C. §§ 2 and 1001(a)(1) (Count V).[2]

Presently before the Court is Defendant Kenneth Smukler's Motion to Suppress the Fruits of the Search of Mr. Smukler's Home Under *Franks v. Delaware* (Document No. 44, filed

---

[1] On March 20, 2018, the Government filed a Superseding Indictment (Document No. 62). Because the Motion addressed in this Memorandum was filed prior to the filing of the Superseding Indictment, the Court sets forth the factual basis from the Indictment. The Superseding Indictment adds five new charges related to Smukler's work on a different campaign, the 2014 campaign of Candidate C,—identified as Marjorie Margolies,—unrelated to the allegations in the original Indictment. The parties agreed that the Superseding Indictment would not alter the facts or the arguments relating to the Motion addressed in this Memorandum – Smukler's Motion to Suppress Under *Franks v. Delaware*.

[2] Count VI of the Indictment pertains only to co-defendant Jones, Smukler's alleged co-conspirator. *See* Indictment, 18.

1

February 2, 2018).[3] The Court heard oral argument on the Motion to Suppress on March 13, 2018.[4] For the reasons that follow, defendant's Motion to Suppress Under *Franks v. Delaware* is denied.

## II. BACKGROUND

The Indictment charges campaign finance violations during the 2012 Democratic congressional primary election campaign between, candidate A—later identified as United States Representative Robert Brady—and candidate B—later identified as Jimmie Moore. The charges are set forth below.

On April 24, 2012, Brady and Moore were to face each other for the Democratic Party's nomination to become a Member of the United States House of Representatives. Indictment ¶¶ 1,2. The Indictment charges that Smukler—a political consultant and associate of Brady—and his co-conspirators arranged for and facilitated payments from the Brady campaign to the Moore campaign to induce Moore to drop out of the 2012 Democratic primary.

Specifically, the Government states that Brady and Moore reached an agreement whereby the Brady campaign would pay Moore $90,000 to cover campaign debts, using intermediaries and, in exchange, Moore would drop out of the primary election race. Indictment ¶ 16(b). On February 29, 2012, Moore dropped out of the primary race. *Id.* ¶ 16(c). Moore and a member of his campaign staff, Carolyn Cavaness,[5] then prepared a list of debts owed by the Jimmie Moore for Congress campaign, which included nearly $90,000 owed to Moore himself and $35,000 owed to Cavaness. *Id.* ¶16(d). Thereafter, Smukler agreed with Moore that the Brady campaign would make three payments totaling $90,000, and it did so. *Id.* ¶¶ 16(e),(f). The first two

---
[3] Five other motions are pending before the Court, each of which seeks dismissal of the Indictment or parts of the Indictment.
[4] The Court also heard oral argument on defendant's Motion to Dismiss the Indictment for Vindictive Prosecution (Document No. 45, filed February 2, 2018). In light of the Superseding Indictment, defendant asked the Court for leave to file a supplemental brief with respect to that Motion and the Court granted defendant leave to do so.
[5] Cavaness served as Moore's campaign manager.

payments, the Government alleges, were to be disguised as payments for the purchase of a poll and the third payment was to be disguised as a payment for consulting services. *Id.* ¶ 16(f). Smukler allegedly instructed Cavaness to form a shell company—CavaSense and Associates, LLC—to facilitate these payments. *Id.* ¶¶16(f),(g).

On June 11, 2012, the Brady for Congress campaign sent a check in the amount of $40,000 to a Smukler owned entity, Voter Link Data Services ("VLDS"). Indictment ¶ 16(l), (m). Two days later, VLDS sent a check in the amount of $40,000 to Cavaness with the memo line, "Poll." *Id.* ¶ 16(n). The Brady for Congress campaign sent a second payment of $25,000 to VLDS on July 10, 2012. Then, on July 17, 2012, VLDS sent a check in the amount of $25,000 to Cavaness bearing the memo line, "Poll." *Id.* ¶¶ 16(r), (s). The Government charges that the parties agreed to justify the first two payments as payments for a poll which analyzed the primary election matchup between Moore and Brady. *Id.* ¶ 16 (h), (i). But by the time the poll was purportedly purchased by Brady, Moore had already dropped out of the race, the poll was more than a year old, and the Brady campaign already had access to a poll nearly identical to the one allegedly purchased from the Moore campaign. *Id.* ¶ 16(i). The final payment of $25,000 was sent by the Brady for Congress campaign to D.A. Jones' entity—D.Jones and Associates— on August 23, 2012. *Id.* 16(x). On August 30, 2012, D. Jones and Associates sent a check to CavaSense in the amount of $25,000 that purported to be payment for consulting services. *Id.* ¶16(y). The Government charges that neither Cavaness nor CavaSense performed any consulting work for the Brady or Jones campaigns. *Id.*

The Indictment further charges that the conspirators caused the Brady campaign to submit campaign finance reports to the Federal Election Commission ("FEC") which falsely described the payments as for consulting services and polling. Indictment ¶ 15(d), 16(o). Finally,

the Indictment states that the conspirators caused the Moore campaign to submit reports to the FEC falsely omitting the payments from the Brady for Congress campaign, VLDS, or D. Jones & Associates. *Id.* at 15(e), 16(z).

Defendant now moves to suppress evidence seized during a search of his residence pursuant to a search warrant.

**III.  APPLICABLE LAW**

A. *Franks v. Delaware*

The Fourth Amendment provides that: "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched and the persons to be seized." U.S. Const. Amend. IV. In *Franks v. Delaware*, 438 U.S. 154 (1978), the Supreme Court held that "a criminal defendant has the right to challenge the truthfulness of factual statements made in an affidavit of probable cause supporting a warrant subsequent to the ex parte issuance of the warrant." *United States v. Yusuf*, 461 F. 3d 373, 383 (3d Cir. 2006). At a *Franks* hearing, the defendant must prove by a preponderance of the evidence: "(1) that the affiant knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create a falsehood in applying for a warrant; and (2) that such statements or omissions were material, or necessary, to the probable cause determination." *Id.*

Upon a finding that the affiant acted knowingly and deliberately, or with a reckless disregard for the truth, courts must determine the materiality of the misstatements and omissions by "excis[ing] the offending inaccuracies and insert[ing] the facts recklessly omitted" to "determine whether or not the 'corrected' warrant affidavit would establish probable cause." *Wilson v. Russo*, 212 F.3d 781, 789 (3d Cir. 2000).

4

B. Campaign Contribution Limits Under the Federal Election Campaign Act

The Federal Election Campaign Act ("FECA") "seeks to remedy any actual or perceived corruption of the political process . . . ." *Berg v. Obama*, 547 F.Supp.2d 509, 525 (E.D.Pa. 2008) (quoting *FEC v. Akins*, 524 U.S. 11, 14 (1998)). Pursuant to that goal, FECA limits the amount of money that an individual may contribute to a candidate for federal office. 52 U.S.C. § 30116(a)(1)(A). In 2012, FECA permitted contributions of up to $2,500 to a candidate from an individual in each election—primary election and general election—in which the candidate competed, for a total of $5,000 in an election cycle.[6] 2 U.S.C. § 441a(a)(1)(A).[7] FECA also limits campaign contributions from one federal candidate's campaign committee to another federal candidate's campaign committee; in 2012, such contributions were limited to $2,000 per candidate for both the primary and general elections, for a total of $4,000 in an election cycle. 2 U.S.C. § 432(e)(3)(B). Contributions made by intermediaries on behalf of a candidate are considered contributions from that candidate. 2 U.S.C. § 441a(a)(7)(B)(i). FECA also requires campaign committees to file quarterly campaign finance reports with the FEC which accurately disclose contributions and expenditures. 52 U.S.C. § 30104.

IV.     DISCUSSION

On March 13, 2017, a magistrate judge issued a search warrant authorizing FBI agents to search defendant's home. A search was carried out on March 21, 2017. Defendant moves to suppress evidence seized during that search. He asserts that FBI Special Agent William M. Bezak omitted a crucial exculpatory fact from the affidavit submitted in support of the search warrant—that the FEC had already investigated and dismissed a claim based on the core facts

---

[6] In 2014, that limit was increased to permit individual contributions of $2,600 in both the primary and general elections, totaling $5,200 in an election cycle. 2 U.S.C. § 441a(a)(1)(A).
[7] In 2014, provisions related to voting and elections were transferred in the United States Code from Titles 2 and 42 to Title 52. Editorial Reclassification Title 52, United States Code.

contained in the affidavit. Accordingly, defendant asks the Court to suppress evidence obtained pursuant to that search warrant.

On March 13, 2018, the Court heard oral argument on the Motion to Suppress. The Court concluded in that proceeding that defendant had shown by a preponderance of the evidence that the affiant, Agent Bezak, intentionally omitted information that the FEC had dismissed a claim against the Margolies campaign from the Affidavit. Hr'g Tr. 29: 12–23. As a consequence, the Court proceeds to step two of the *Franks* inquiry by inserting the omitted information in the original affidavit to determine whether the "corrected" affidavit would establish probable cause. *See United States v. Rivera*, 347 Fed. App'x 833, at *838 (3d Cir. Oct. 6, 2009) (citing *Wilson*, 212 F.3d at 789)). To do so, the Court must examine both the Affidavit and the FEC decision to determine what impact, if any, the inclusion of information regarding the FEC dismissal would have had on the magistrate judge's probable cause determination.

A. The Bezak Affidavit

FBI agents searched defendant's home on March 21, 2017, pursuant to a warrant issued by a magistrate judge on March 13, 2017. The search warrant was issued based on an Affidavit submitted to the magistrate judge by Special Agent Bezak (the "Affidavit"). The Affidavit contained allegations arising from two separate investigations: the first related to possible campaign finance violations by Marjorie Margolies's campaign during the 2014 Democratic Primary election for the United States House of Representatives in Pennsylvania's 13th Congressional District and the second related to the Smukler's alleged involvement with the Brady and Moore primary election campaigns in 2012. Memo. Supp. Mot. to Suppress, 2–3. The omitted FEC decision addressed only alleged violations by the Margolies campaign.[8]

---

[8] Margolies' 2014 Primary election campaign is the subject of charges added by the Superseding Indictment filed on March 20, 2018.

6

### i. *The Margolies Investigation*

The Affidavit stated that there was probable cause to believe that Smukler, Margolies, and others conspired to violate federal campaign finance laws, produce false records, cause false campaign contribution reports, and violate federal campaign finance laws that limit campaign contributions and expenditures. According to the Affidavit, Smukler was Margolies's senior campaign advisor and communications consultant for the 2014 Democratic Primary. Memo. Supp. Mot. to Suppress, Ex. 4, Bezak Affidavit ¶ 17. The Affidavit stated that Margolies and Smukler "attempted to conceal their campaign finance violations in a number of ways, including . . . by providing materials [sic] false information in response to an inquiry from the Federal Election Commission." *Id.* ¶ 6. To carry out the conspiracy, Smukler facilitated payments from contributors to the campaign through two political consulting firms which he owned, Black Blue Media ("BBM") and Info Voter Technologies, Inc. ("IVT").

Specifically, the Affidavit asserted that during the 2014 primary election campaign, the Margolies campaign received illegal campaign contributions, passed through by Smukler's entities. According to the Affidavit, the Margolies campaign received campaign contributions for the general election, and then used these contributions for payment of primary election expenses in violation of FEC rules and regulations. When Margolies lost the 2014 primary election, the campaign was required to refund general election contributions to the contributors. However, because the Margolies campaign had used general election contributions to pay for primary election expenses, the campaign lacked the required cash to refund the general election contributions. To replenish the campaign account for the purpose of refunding those general election contributions, the campaign sought and received illegal campaign contributions that exceeded the maximum allowable contributions. To conceal the unlawful primary election

7

campaign contributions, the Margolies campaign falsely reported to the FEC that the payments were "refunds" of money paid to consultants to secure services for the general election contest.

For example, the Affidavit asserted that the Margolies campaign used an illegal campaign contribution to pay for services provided by the Joe Slade White Company (JSWC), a political media strategy and production firm. Memo. Supp. Mot. to Suppress, Ex. 4, Bezak Affidavit ¶ 31. According to the Affidavit, Smukler transferred $78,750 from his personal brokerage account into BBM's bank account on May 2, 2014. *Id.* ¶32. Three days later, BBM transferred that same amount to a Margolies campaign account at Bank of America. *Id.* Just one day after BBM transferred that money to the Margolies campaign account, the Margolies campaign wired $78,750 to JSWC. And the Affidavit stated that just one day later, "these funds provided by Smukler were replenished . . . by way of a $75,000 wire transfer from an account held . . . by Andrew Smukler," the defendant's brother. *Id.* ¶ 33. The Margolies campaign then falsely reported to the FEC that the payment in the amount of $78,750 made by BBM to the Margolies campaign was a refund for general election services. *Id.* ¶ 35.

The Affidavit further stated that a similar scheme was used to transfer $150,000 in illegal campaign contributions from Smukler's entities to the Margolies campaign. Smukler transferred approximately $150,000 from his brokerage account into BBM and IVT accounts;[9] those funds were then transferred from BBM and IVT to the Margolies campaign account. Smukler's personal account was replenished by a transfer of $150,000 from a JP Morgan trust account.[10] Again, the Affidavit stated that the Margolies campaign concealed this illegal campaign contribution by falsely claiming to the FEC that the payments from BBM and IVT were refunds

---

[9] BBM transferred $40,000 to the Margolies campaign, while IVT transferred $110,000. Memo. Supp. Mot. to Suppress, Ex. 4, Bezak Affidavit ¶ 43.
[10] The JP Morgan Trust account beneficiary was Kevin Morgan, who the Affidavit asserts had "no known interest or involvement in BBM, IVT, or the Margolies's [sic] campaign." Memo. Supp. Mot. to Suppress, Ex. 4, Bezak Affidavit ¶¶ 41, 42.

for general election services which were no longer necessary. *Id.* ¶ 43. Without the illegal campaign contributions received from the JP Morgan trust account and from Smukler's brother, the Margolies campaign would have lacked the cash needed to make refunds to its general election donors. *Id.* ¶ 40.

In response to an inquiry by the FEC, the Margolies campaign reported that the payments made to BBM and IVT—and later purportedly refunded by those entities—were used to retain consultants for the general election in the event that Margolies won the primary election. In fact, BBM and IVT used those funds to pay for consultants—Johnathon Saidel and DA Jones & Associates—who performed services in connection with Margolies' *primary* campaign. *Id.* ¶¶ 52–57.[11]

Continuing, the Affidavit stated that the Margolies campaign misled the FEC in response to an inquiry into a discrepancy between the amount initially paid to IVT and the amount that IVT purportedly refunded. *Id.* ¶¶ 45,46. The Margolies campaign paid IVT $92,000 during the 2014 primary. According to the Affidavit, when the Margolies campaign lacked sufficient cash-on-hand to refund its general election contributors, IVT submitted a payment of $110,000 to the campaign—$18,000 more than it had initially received. *Id.* ¶ 45. When the FEC asked the Margolies campaign to explain this apparent overpayment, the Margolies campaign responded that it made the overpayment in error and that it had since refunded the $18,000 to IVT. *Id.* ¶ 47. The Affidavit stated that the Margolies campaign did in fact refund the payment to IVT, which resulted in a near-negative campaign account balance. *Id*. ¶¶ 49, 50. To replenish the account, Margolies loaned approximately $23,750 to the campaign account. *Id*. ¶50. Just one day before Margolies loaned that money to the campaign account, BBM issued a check in the amount of

---

[11] The Affidavit included a chart containing information that the initial payments to BBM and IVT were reported in FEC disclosure forms as disbursements for primary election expenses. Memo. Supp. Mot. to Suppress, Ex. 4, The Bezak Affidavit, ¶ 28.

$25,000 to Margolies' personal bank account. *Id.* The Margolies' campaign then filed a false campaign finance report stating that the $23,750 payment to the campaign was a loan from Margolies. *Id.* ¶¶50, 51. According to the Affidavit, the payment was an illegal campaign contribution from BBM. *Id.*

A third Smukler-controlled entity, Liberty City Press ("Liberty City"),[12] was also allegedly used to facilitate illegal campaign contributions to the Margolies campaign. The Affidavit stated that Liberty City made eight payments totaling $42,500 to Margolies' personal account between the date that Margolies entered the primary and the date of the primary election. *Id*. at ¶¶ 58–60. Margolies then transferred $44, 625 from her personal account to Liberty City's bank account—$2,125 more than Margolies received. *Id.* ¶ 61. The Affidavit stated that the "timing and circular nature of these transactions" are indicative of unreported and improper campaign contributions. *Id.* ¶ 61.

### ii. The Brady/Moore Investigation

The Affidavit also contained allegations related to the Brady and Moore campaigns. Specifically, the Affidavit stated that "Smukler's corporations were utilized as a pass through by which the campaign debt belonging to another candidate for federal office was paid down." *Id.* ¶ 7. The Affidavit sets forth a series of financial transactions between the Brady campaign, Smukler's political consulting entity, VLDS, and Carolyn Cavaness, Jimmie Moore's campaign manager. According to the Affidavit, VLDS submitted two checks—one for $40,000 and one for $25,000—to Cavaness. *Id.* ¶¶ 67, 68. Days prior to each payment from VLDS to Cavaness, VLDS received checks in the same amount from the Brady for Congress account. *Id*. The Affidavit stated that "[t]he timing of these transactions suggests that VLDS was used to pass an

---

[12] According to the Affidavit, Liberty City provides approximately 72% of BBM's income. *Id.* ¶ 62.

illegal campaign contribution from Brady to Moore to pay down Moore's campaign debt." *Id.* ¶ 66.

  B. <u>The FEC dismissal of charges against the 2014 Margolies primary election campaign</u>

  On April 29, 2014, the FEC commenced an investigation into the Margolies campaign and Jennifer May, the campaign's treasurer, for alleged violations of 11 C.F.R. § 102.9(e)(2). *See* Memo. Supp. Mot. Suppress, Ex. 1. Ultimately, the FEC determined that no violation of 11 C.F.R. § 102.9(e)(2) had occurred and dismissed the complaint against the Margolies campaign and May. *Id.*

  Under 11 C.F.R. § 102.9(e)(2), a campaign is permitted to receive contributions for the general election prior to the primary election, as long as the campaign distinguishes between primary and general election contributions. *Id.* General election contributions received prior to the primary election may be used to make advance payments necessary to secure vendors and services for the general election. *Id.* Campaigns must also maintain cash-on-hand that is at all times equal to or greater than the net general election funds.[13] *Id.* The FEC complaint alleged that the Margolies campaign violated this provision by spending general election funds on consultants and other vendors for the primary election and by failing to maintain sufficient cash to make the required refunds. *Id.*

  In response to the FEC inquiry, the campaign reported that it "agreed to advance a portion of these funds to its principal campaign vendors in order to secure their services, availability and commitment for the general election." *Id.* The campaign informed the FEC that these funds were advanced on the condition that if Margolies lost in the primary election, the funds would be refunded. *Id.* The campaign also provided to the FEC a list detailing four such

---

[13] The net general election funds are the sum of general election contributions less the sum of general election disbursements. Memo. Supp. Mot. Suppress, Ex. 1.

refunds from BBM and IVT totaling $150,000. *Id.* The FEC decision stated that the Margolies campaign "confirmed that the refunds from Info Voter Technologies were made to refund general election advances." *Id.* Accordingly, the FEC concluded that these advances "reduce its net general election funds which in turn, reduces the amount of cash-on-hand necessary" to meet the statutory requirement. *Id.*

The FEC decision also considered the overpayment by IVT to the campaign. The campaign disclosed disbursements totaling $92,000 to IVT, but reported that IVT paid the campaign $110,000 in refunds. *Id.* n.14. When the FEC inquired about the $18,000 excess refund, the campaign reported to the FEC that the overpayment was made in error and that it had refunded the $18,000 to IVT. *Id.*

The FEC thus dismissed the complaint against Margolies and May on the ground that the advance payments by the campaign to the vendors "may have eliminated any deficit under Section 102.9(e)(2)." *Id.*

### C. Materiality

Defendant argues that the FEC dismissed a complaint based on the central allegations in the search warrant affidavit, and, if information regarding the FEC's dismissal had been included in the Affidavit, the magistrate judge could not have found probable cause to issue the search warrant. The Court disagrees. An examination of both the FEC dismissal and the Affidavit reveals that the allegations in the Affidavit exceeded the scope of and alleged substantially different conduct than was covered in the FEC decision. The Court concludes that, after inserting the omitting information regarding the FEC dismissal, the Affidavit supports a finding of probable cause.

As an initial matter, the Affidavit stated that there was probable cause to believe that Smukler and Margolies "committed violations of 18 U.S.C. § 371 (conspiracy), 18 U.S.C. § 1519 (producing false records), 52 U.S.C. § 30104 (causing false campaign contribution reports), and 52 U.S.C. 30116 (limits on campaign contributions and expenditures)." Memo. Supp. Mot. Suppress, Ex. 4, Bezak Affidavit ¶ 5. By contrast, the FEC investigation focused on allegations that the Margolies campaign violated 11 C.F.R. § 102.9(e)(2). The violations in the Affidavit may arise out of the same core set of facts as the FEC decision, but the Affidavit alleged distinct criminal violations.

Defendant asserts that, because the Affidavit relied on the same core facts which were the subject of the FEC investigation resulting in a dismissal, it follows that had the magistrate judge known about the FEC dismissal, a warrant would not have issued. However, defendant ignores the fact that the Affidavit stated the Margolies campaign and Smukler provided false information to the FEC during the course of that investigation by disguising certain unlawful campaign contributions as "refunds" in FEC disclosure forms and in response to the FEC's inquiry. The Affidavit necessarily included information that overlapped with the FEC investigation, because the Affidavit stated that Smukler and the Margolies campaign falsified campaign finance reports and provided false information to the FEC to disguise illegal campaign contributions as refunds.

Defendant also argues that the FEC decision disposed of allegations in the Affidavit as to the apparent overpayment by IVT to the Margolies campaign. The FEC decision stated that the Commission investigated a discrepancy between a reported disbursement by the campaign in the amount of $92,000 to IVT and the amount reportedly refunded by IVT of $110,000. In response to the FEC's inquiry regarding the overpayment, the Margolies campaign stated that the $18,000 overpayment was a mistake and confirmed that it had refunded that sum to IVT. The Affidavit

13

contradicted the FEC's findings with respect to the overpayment and alleged that the campaign used an unlawful campaign contribution to conceal the overpayment in light of the FEC's inquiry. Specifically, the Affidavit stated that Margolies loaned approximately $25,000 to the campaign to replenish funds which were reimbursed by the campaign to IVT. The Affidavit further stated that these funds were traceable to a payment by BBM of $25,000 to Margolies' personal account. This information went well beyond the scope of the FEC inquiry and decision and primarily concerned the concealment of illegal campaign contributions from the FEC, rather than the charged overpayment.

Other portions of the Affidavit claimed that BBM and IVT did in fact use the money received from the campaign to pay consultants and vendors for work on the primary election campaign. While the campaign was permitted to advance payments to vendors and consultants to secure their services for the general election—and indeed, the FEC decision determined that such refunds did not violate the prohibition on using general election funds for primary expenses,—the vendors who received the advances were not permitted to use those monies for primary election expenses. The Affidavit asserted that, contrary to what the campaign reported to the FEC in its disclosures and in the subsequent FEC inquiry, the campaign could not have received "refunds" of general election expenses because the money initially provided to BBM and IVT was used to pay primary election expenses.

In comparing the Affidavit and the FEC decision, the Court concludes that the Affidavit alleged a scheme by the Margolies campaign and the Smukler-controlled entities to facilitate unlawful campaign contributions through Smukler's entities for use in the primary election and then later disguise those contributions as "refunds" of general election contributions; the FEC was unaware of the scheme because the Margolies campaign misrepresented these payments in

campaign finance reports and in response to the inquiry into the refunds.  Accordingly, the Court concludes that if the Affidavit had included a statement that the FEC conducted an investigation into potential violations of §102.9(e)(2) by the Margolies campaign and dismissed the charges, that information would not have altered the probable cause determination with respect to the allegations of conspiracy to violate campaign finance laws through unlawful campaign contributions, filing false campaign reports, and producing false documents.

## V. CONCLUSION

For the aforementioned reasons, Defendant Kenneth Smukler's Motion to Suppress the Fruits of the Search of Mr. Smukler's Home Under *Franks v. Delaware* is denied.  An appropriate Order follows.