# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES | CRIMINAL ACTION |
| v. | |
| KENNETH SMUKLER | NO. 17-563-02 |

DuBois, J.                                                                                           July 13, 2018

## M E M O R A N D U M

### I.     INTRODUCTION

On October 24, 2017, a federal grand jury in the Eastern District of Pennsylvania named defendant Kenneth Smukler and co-defendant Donald "D.A." Jones in a six count Indictment. On March 20, 2018, the Government filed a Superseding Indictment. The Superseding Indictment charges Smukler with: participation in a conspiracy in violation of 18 U.S.C. § 371 (Count I); causing unlawful campaign contributions in violation of 52 U.S.C. §§ 30109(d)(1)(A)(i), 30116(f), and 18 U.S.C. § 2 (Counts II & VII); causing false campaign reports in violation of 52 U.S.C. §§§ 30104(a)(1), 30104(b)(5)(A), 30109(d)(1)(A)(i), and of 18 U.S.C. § 2 (Counts III, IV & X); causing false statements in violation of 18 U.S.C. §§ 2 and 1001(a)(1) (Count V & VI); making contributions in the name of another in violation of 52 U.S.C. §§ 30109(d)(1), 30116(f), 30122, and 18 U.S.C. § 2 (Counts VIII & IX); obstruction of a pending agency proceeding in violation of 18 U.S.C. §§ 2 and 1505.

Presently before the Court is Defendant Kenneth Smukler's Motion to Dismiss the Indictment for Vindictive Prosecution (Document No. 45, filed February 2, 2018). The Court conducted a hearing on the Motion on March 13, 2018. At that hearing, counsel for defendant requested leave to file a supplemental memorandum in support of defendant's Motion to Dismiss the Indictment for Vindictive Prosecution in light of the Superseding Indictment, which the Court

granted. For the reasons that follow, defendant's Motion to Dismiss the Indictment for Vindictive Prosecution is denied. The Court also denies defendant's request for discovery on the issue of vindictiveness.

## II. BACKGROUND

The Superseding Indictment charges defendant with campaign finance violations in connection with two congressional campaigns: (1) the 2012 congressional primary campaign of United States Representative Robert Brady ("Brady") and (2) the 2014 congressional primary campaign of Marjorie Margolies. The charges are summarized below.

### A. Charges Related to Brady for Congress Campaign

On April 24, 2012, Candidate A—later identified as Robert Brady—was to face Jimmie Moore for the Democratic Party's nomination for Member of the United States House of Representatives. Superseding Indictment Count I ¶ 1. The Superseding Indictment charges that defendant—a political consultant and close associate of Brady—and his co-conspirators arranged for and facilitated payments from the Brady campaign to the Moore campaign to induce Moore to drop out of the 2012 Democratic primary. *Id.* ¶ 12.

Specifically, the Government states that Brady and Moore reached an agreement whereby the Brady campaign would pay Moore $90,000 to cover campaign debts, using intermediaries and, in exchange, Moore would drop out of the primary election race. Indictment ¶ 16(a),(e). On February 29, 2012, Moore withdrew from the primary race. *Id.* ¶ 16(c). Moore and a member of his campaign staff, Carolyn Cavaness,[1] then prepared a list of debts owed by the Jimmie Moore for Congress campaign, which included nearly $90,000 owed to Moore himself and $35,000 owed to Cavaness. *Id.* ¶16(d). Thereafter, defendant agreed with Moore that the Brady campaign would make three payments totaling $90,000, and it did so. *Id.* ¶¶ 16(e),(f). The first

---

[1] Cavaness served as Moore's campaign manager.

two payments, the Government alleges, were to be disguised as payments for the purchase of a poll and the third payment was to be disguised as a payment for consulting services. *Id.* ¶ 16(f). Defendant allegedly instructed Cavaness to form a shell company—CavaSense and Associates, LLC—to facilitate these payments. *Id.* ¶¶16(f),(g).

On June 11, 2012, the Brady for Congress campaign sent a check in the amount of $40,000 to defendant's entity, Voter Link Data Services ("VLDS"). Indictment ¶ 16(l), (m). Two days later, VLDS sent a check in the amount of $40,000 to Cavaness with the memo line, "Poll." *Id.* ¶ 16(m). The Brady for Congress campaign sent a second payment of $25,000 to VLDS on July 10, 2012. *Id.* ¶ 16(r). Then, on July 17, 2012, VLDS sent a check in the amount of $25,000 to Cavaness bearing the memo line, "Poll." *Id.* ¶ 16(s). The Government charges that the parties agreed to justify the first two payments as payments for a poll which analyzed the primary election matchup between Moore and Brady. *Id.* ¶¶ 16 (h),(i). But by the time the poll was purportedly purchased by Brady, Moore had already dropped out of the race, the poll was more than a year old, and the Brady campaign already had access to a poll nearly identical to the one allegedly purchased from the Moore campaign. *Id.* ¶ 16(i). The final payment of $25,000 was sent by the Brady for Congress campaign to D.A. Jones' entity—D.Jones and Associates—on August 23, 2012. *Id.* 16(x). On August 30, 2012, D. Jones and Associates sent a check to CavaSense in the amount of $25,000 that purported to be payment for consulting services. *Id.* ¶16(y). The Government charges that neither Cavaness nor CavaSense performed any consulting work for the Brady or Jones campaigns. *Id.*

At Moore's direction, Cavaness used $21,000 of the money provided through VLDS and D.Jones & Associates to pay vendors owed by the Moore for Congress campaign. *Id.* 16(bb). Cavaness also paid $19,500 directly to Moore by checks bearing the memo line

3

"Reimbursement." *Id.* 16(cc). The Superseding Indictment states that Cavaness and Moore kept the remainder of the money provided by Brady through VLDS and D.Jones & Associates in Cavaness's personal bank account. *Id.* 16(dd).

The Superseding Indictment further charges that the conspirators caused the Brady campaign to submit campaign finance reports to the Federal Election Commission ("FEC") which falsely described the payments as for consulting services and polling. Indictment ¶¶ 16(o),(v)(z). Finally, the Superseding Indictment states that the conspirators caused the Moore campaign to submit reports to the FEC falsely omitting the payments from the Brady for Congress campaign, VLDS, or D. Jones & Associates. *Id.* at ¶¶¶ 16(ee),(ff),(gg),(hh).

### B. Charges Related to Marjorie 2014 Campaign

Candidate "C"—later identified as Marjorie Margolies—ran in the 2014 Democratic primary election for Pennsylvania's Thirteenth Congressional District. Superseding Indictment Count VI, ¶3. During that time, defendant owned and operated two political consulting companies, Black and Blue Media Inc. ("BBM") and InfoVoter Technologies ("InfoVoter"). *Id.* ¶9a. BBM and InfoVoter received approximately $210,750 from Marjorie 2014—Margolies' campaign committee—for expenses associated with the primary election.[2] *Id.*

The Federal Election Campaign Act ("FECA") prohibits candidates from spending campaign contributions raised for the general election on expenses in connection with the primary election. Superseding Indictment Count I ¶ 9(f). A candidate who does not prevail in the primary election is required to refund any contributions raised for the general election. *Id.*

According to the Superseding Indictment, the Margolies campaign ran out of funds that it could lawfully spend on the primary election. Superseding Indictment, Count V ¶ 9(c). As a

---

[2] BBM and InfoVoter *did* in fact pay other campaign vendors for services associated with the Marjorie 2014 primary election. *Id.* ¶ 9(b).

4

result, in or about April and May of 2014, defendant directed Jennifer May, the campaign treasurer, to continue spending funds, thus causing the campaign to impermissibly spend funds raised for the general election on primary election expenses. *Id.* On April 29, 2018, defendant informed May that he would wire $78,750 to the campaign from BBM. *Id.* ¶ 9(d). On May 2, 2014, defendant wired $78,750 from his personal brokerage account to BBM. *Id.* ¶ 9(e),(f). He then transferred those funds from BBM to the campaign on May 5, 2014. *Id.* ¶ 9(d). Defendant's personal account was subsequently replenished in the amount of $75,000, on May 7, 2014, by a close associate. *Id.* ¶ 9(g). As a consequence, the Government charges that Marjorie 2014 submitted a report to the FEC on July 15, 2014, which falsely described the payment from BBM as a "refund," when the payment was actually an unlawful campaign contribution. *Id.* ¶ 9(h).

Margolies subsequently lost the primary election. Following that loss, the campaign lacked sufficient funds to refund general election contributions as required under FECA, because it had impermissibly spent funds designated for the general election on primary election expenses. *Id.* ¶ 9(i). Defendant told May that the general election contributions had been "escrowed" in an InfoVoter account and that InfoVoter would issue the refunds to the campaign. *Id.* ¶ 9(j). In reality, the Government charges that defendant used unlawful campaign contributions—which he funneled through InfoVoter and BBM—to replenish the campaign account. *Id.* ¶¶ 9(k)–(o). Specifically, a close associate of defendant wired $150,000 to defendant's personal brokerage account on July 11, 2014. *Id.* ¶ 9(k). Two days later, defendant wired $40,000 to BBM and $110,000 to InfoVoter. *Id.* ¶¶ 9(l),(m). On July 14, 2018, BBM and InfoVoter wired the money received from defendant to a bank account associated with the Margolies campaign. *Id*. ¶¶ 9(n),(o). The Government alleges that, as a result of these payments, defendant caused the

5

Marjorie 2014 campaign to file FEC reports falsely stating that the payments were "refunds" of general election expenses, when they were unlawful campaign contributions. *Id.* ¶¶ 9(p),(q).

In April of 2014, Margolies' primary challenger, Daylin Leach, filed a complaint with the FEC in which he alleged that her campaign had unlawfully used general election funds in connection with primary election expenses. The Margolies campaign retained Perkins Coie attorney Karl Sandstrom in connection with the FEC inquiry. The Government alleges that defendant misrepresented the nature of the "refunds" allegedly issued from BBM and InfoVoter—which were in fact, unlawful campaign contributions—to Sandstrom. Superseding Indictment Count V, ¶ 9(r). As a consequence, the Government charges that defendant caused Sandstrom to falsely report to the FEC that they payments made by BBM and InfoVoter to the campaign were refunds of general election expenses. *Id.* The FEC subsequently dismissed the complaint filed by Daylin Leach. *Id.*

In June 2015, the FEC determined that InfoVoter had refunded to the Margolies campaign approximately $18,000 more than the campaign had paid it initially. *Id.* ¶ 9(t). As a consequence, the Margolies campaign was required to repay InfoVoter the excess $18,000. *Id.* After the campaign repaid InfoVoter the $18,000, the campaign account had a negative balance. *Id.* ¶ 9(v). To replenish the campaign account, the Government alleges that defendant sent a check for $25,000 from BBM to Margolies' personal bank account and instructed Margolies to transfer $23,750 from her personal account to the campaign account. *Id.* The Government charges that defendant caused Marjorie 2014 to file a report with the FEC which falsely stated

that the $23,750 payment from Margolies' personal account to the campaign was a loan from the candidate herself, when in fact, the payment was an unlawful campaign contribution. *Id.* ¶ 9(w).[3]

## III. APPLICABLE LAW

"Prosecutorial vindictiveness may occur when the government penalizes a defendant for invoking legally protected rights. *United States v. Schoolcraft*, 879 F.2d 64, 67 (3d Cir. 1989). In assessing a claim of vindictive prosecution, "courts must begin from a presumption that the government has properly exercised its constitutional responsibilities to enforce the nation's laws." *United States v. Jarrett*, 447 F.3d 520, 525 (7th Cir. 2006) (citing *United States v. Armstrong*, 517 U.S. 456, 463 (1996). This presumption may be overcome only by "clear evidence to the contrary." *Id.* (quoting *Armstrong*, 517 U.S. 463 – 64).

A defendant may show prosecutorial vindictiveness by: (1) producing evidence of actual vindictiveness; or (2) by demonstrating circumstances that reveal a realistic likelihood of vindictiveness to warrant a presumption of vindictiveness. *United States v. Paramo*, 998 F.2d 1212, 1220 (3d Cir. 1993). "[W]here the government's conduct is attributable to legitimate reasons, we will not apply a presumption of vindictiveness." *Id.* (citations omitted). If the defendant establishes a realistic likelihood of vindictiveness, the government may proffer legitimate, objective reasons for its conduct. *Id.*

## IV. DISCUSSION

Defendant asserts that the Government seeks to penalize him for exercising his First Amendment Right to criticize the government through the publication of a series of newspaper articles that he wrote for the Liberty City Press ("Liberty City"), a newspaper that he owns and

---

[3] In addition to the above allegations, the Government further alleges that defendant instructed Jones to contribute to the Margolies campaign between December 2013 and May 2014 on the promise that he would later refund those payments, which he did. *Id.* ¶ 9(x).

7

operates.[4] Defendant does not assert that he can produce evidence of actual vindictiveness, but instead argues that the timing of the investigation in relation to the publication of the newspaper articles, combined with the overly broad investigation conducted by the FBI, alleged defects in the indictment, and the fact that the two primary beneficiaries of the alleged payments—Brady and Margolies[5]—were not charged, demonstrate that the circumstances of the prosecution reveal a realistic likelihood of vindictiveness sufficient to warrant a presumption of vindictiveness.

    i. <u>Liberty City Press and the Government's Investigation</u>

In his Motion, defendant sets forth a timeline of events, recited below, that he argues demonstrates that the Government's decision to investigate him stemmed from the publication of several newspaper articles in which he criticized the United States Attorney's Office ("USAO") and the FBI.

Central to defendant's Motion is a series of articles beginning in October of 2015, in which Liberty City published articles about a scandal referred to as "Porngate." Porngate referred to the circulation of email communications which contained racist, misogynistic, homophobic, and sexually explicit content among public officials, including certain Pennsylvania judges, federal and state prosecutors, and others. *See* Memo. Supp. Mot. to Dismiss for Vindictive Prosecution at 1. The federal prosecutors allegedly involved were Assistant United States Attorneys ("AUSA") employed by the USAO for the Middle District of Pennsylvania. *Id.* Between October of 2015 and March of 2016, Liberty City penned six articles related to the scandal that criticized those involved in the scandal. For example, in one article, Liberty City calls for all those individuals who circulated the emails to face disciplinary measures and in

---

[4] The Court notes that, while defendant's Motion states that he authored the editorials upon which he relies, the author is identified as "Editorial Board."
[5] The Government states that the evidence will show that defendant lied to Margolies regarding the circumstances of the payments made by his entities. *See* Govt.'s Resp. to Def.'s Supp. Memo. Support Mot. to Dismiss for Vindictive Prosecution at 4.

8

another, the Editorial sheds light on the offensive content of those emails.  *See* Memo. Supp. Mot. to Dismiss for Vindictive Prosecution, Ex. 3, 5.  Liberty City criticized various media outlets for their failure to publish the names of those public officials who circulated the offensive emails, including "district attorneys, police chiefs, public defenders, and assistant U.S. attorneys." *Id.* at Ex. 15.  Another Editorial specifically criticized the then-U.S. Attorney for the Middle District of Pennsylvania for his failure to investigate "at least four assistant U.S. attorneys" on these email chains. *Id.* at Ex. 9.

Defendant's involvement in Porngate went beyond authoring editorials for Liberty City, and on October 27, 2015, the Philadelphia Inquirer named him as the person who had leaked the Porngate emails to several media outlets.  *See* Memo. Supp. Mot. to Dismiss for Vindictive Prosecution, Ex. 4.   Shortly after the Philadelphia Inquirer revealed that defendant was responsible for circulating the emails, Liberty City published some of those emails.  *Id.* at 10, Ex. 5. Attorney General Kathleen Kane—for whom defendant worked as a political consultant— subsequently appointed a special prosecutor to conduct an investigation into the Porngate emails in December 2015.  *Id.* at Ex. 6.

Defendant also cites two articles that specifically reference the Eastern District of Pennsylvania and the two prosecutors involved in this case.  On September 8, 2015, defendant authored an editorial in Liberty City Press in which he criticized the conduct of the USAO for the Eastern District of Pennsylvania and, more specifically, AUSA Eric Gibson—one of the prosecutors in this case—for filing a motion in connection with the prosecution of Congressman Chaka Fattah that accused Fattah of attempting to influence potential jurors.  The article accuses the USAO and Gibson of "prosecutorial hyperbole" and criticizes the prosecution for interfering with Fattah's First Amendment Rights.  *See* Memo. Supp. Mot. to Dismiss for Vindictive

9

Prosecution, Ex. 1. Defendant also points to one other article unrelated to the Porngate scandal, published in February 2017, in which Liberty City criticized the Department of Justice's failed prosecution of State Senator Larry Farnese. That article specifically mentions Jonathan Kravis, one of the prosecutors in this case, and criticizes him for advancing a "dumb" theory that ultimately failed when presented to a jury. *See* Memo. Supp. Mot. to Dismiss for Vindictive Proseuction, Ex. 29.

Defendant argues that the publication of these articles—and the revelation that he leaked Porngate emails to the media—corresponds to key dates in the Government's investigation. For example, defendant asserts that the Government commenced the investigation in January and February of 2016, "a little more than two months after he was outed as being in possession of the Porngate emails." Memo. Supp. Mot. to Dismiss for Vindictive Prosecution at 11. In March and April of 2016,—after a March 2, 2016, Liberty City editorial urging the major news outlets to publish the names of officials involved in Porngate—the Government received defendant's telephone and bank records. *Id.* at 12–13. And in May of 2016, the FBI began surveillance of defendant, including surveilling his home, his workplace, and other sites. *Id.* at 13. In July and August of 2016, the Government conducted searches and sought records related to defendant's entities. *Id.* The investigation continued into the fall of 2016 as the Government sought defendant's mail and additional banking records, and began investigating defendant's co-conspirators. *Id.* at 14–15. On March 13, 2017, the FBI sought a warrant to search defendant's home and searched defendant's home on March 21, 2017. *Id.* Finally, on October 24, 2017, a Grand Jury indicted defendant. *Id.* at 20.

    ii. <u>Presumption of Vindictiveness</u>

Defendant sets forth a litany of reasons that the Superseding Indictment clearly reveals a realistic likelihood of vindictiveness to warrant a presumption of vindictiveness including,

broadly, that: (1) the timeline of the investigation corresponds with the publication of the Liberty City articles; (2) the nature of the investigation; (3) alleged defects in the Superseding Indictment create a presumption of vindictiveness; and (4) the treatment of defendant's alleged co-conspirators, including failure to indict Brady and Margolies, creates a presumption of vindictiveness. The Court addresses these arguments in turn and concludes that defendant has failed to demonstrate that the circumstances of the prosecution reveal a realistic likelihood of vindictiveness to warrant a presumption of vindictiveness.

      *a.    Timeline and Nature of the Investigation*

Defendant argues that the timeline of the investigation, which he asserts corresponds with the publication of the critical articles, and the Government's aggressive investigation into his conduct, reveals a realistic likelihood that of vindictiveness. The Court disagrees.

Defendant's timeline establishes little more than that the investigation commenced within a few months of the revelation that defendant was responsible for leaking documents related to Porngate. First, there is no evidence that prosecutors in the Eastern District of Pennsylvania were implicated in Porngate. Moreover, defendant has not presented any evidence that either of the AUSAs working on this case—or any employee of the USAO for the Eastern District—read or was aware of the articles published by Liberty City. The vast majority of the newspaper editorials included in defendant's timeline relate to a scandal that implicated attorneys in the Middle District of Pennsylvania, not the Eastern District. The Court concludes that the articles, which primarily levy criticism at AUSAs in the Middle District of Pennsylvania, absent any evidence that Eastern District prosecutors were involved in the purported scandal or were aware of the articles, cannot establish a realistic likelihood of vindictiveness that gives rise to a presumption of vindictiveness.

11

To the contrary, defendant's timeline of the investigation—which shows that the Government gathered extensive information, including business, telephone, and bank records, before obtaining a search warrant and seeking an Indictment by a grand jury—supports the Government's position that it's decision to prosecute was based on "the usual determinative factors." *Schoolcraft*, 879 F.2d at 68; *see also Bordenkircher v. Hayes*, 434 U.S. 357. 364 (1978) ("so long as the prosecutor has probable cause to believe that the accused committed an offense . . . . the decision whether or not to prosecute . . . generally rests entirely in his discretion"); *United States v. Zamichieli*, 2015 WL 366147, at *5 (E.D.Pa. June 15, 2015) ("where the government's conduct is attributable to legitimate reasons, we will not apply a presumption of vindictiveness").

b. *The Nature of the Investigation*

Defendant also asserts that throughout the course of the investigation, the Government ignored DOJ policy requiring consultation with the FEC prior to beginning an investigation into campaign finance violations, conducted "months of government surveillance of Mr. Smukler and his residence," "conducted broad . . . background and record searches so close to the revelation that Mr. Smukler was providing Porngate emails to the media," violated defendant's attorney-client privilege, and granted immunity to Margolies. Reply at 4. These actions, defendant argues, give rise to a presumption of vindictiveness. The Court disagrees.

First, with respect to defendant's contention that DOJ policy requires consultation with the FEC prior to commencing a criminal investigation into campaign finance violations, defendant misrepresents the DOJ policy in question. The policy requires that prosecutors consult with the DOJ's Public Integrity Unit, not directly with the FEC. Def.'s Mot. to Dismiss for Vindictive Pros., Ex. 3, at 18. According to the Government, that consultation took place. Defendant has

12

presented no evidence—other than his own assertion—that the Government failed to consult with the Public Integrity Unit.

With respect to defendant's contentions regarding the Government's surveillance of defendant and broad background and records searches, the Government is not required to provide the defendant with information regarding its investigation or charging decisions. "The defendant bears the initial burden of proof in a vindictive prosecution claim . . .; [t]he burden then shifts to the prosecution to show that the prosecutor's decision to prosecute was justified." *Schoolcraft*, 879 F.2d at 68. Defendant in this case has not met his initial burden of proof to show a realistic likelihood of vindictiveness and therefore, the Government is under no obligation to justify its decision to prosecute. Moreover, Rule 16 does not require the disclosure of such information and, to the contrary, "reports, memoranda, or other internal government documents made by an attorney for the government or other government agent in connection with investigating or prosecuting the case" are not subject to disclosure. Fed.R.Crim.P. § 16(a)(2).[6]

Defendant further argues that the Government's investigation into his conduct with respect to the Margolies campaign shows a realistic likelihood of vindictiveness because the Government obtained an invalid waiver of privilege from Margolies and ultimately granted her immunity. Defendant's claim that the Government violated his attorney-client privilege is the subject of another motion and the Court will address that issue when it decides that motion. At this juncture, based on the record presented with this motion, the Court concludes that there is no evidence that the Government's decision to prosecute defendant was motivated by an improper purpose. With respect to defendant's assertion that the fact that Margolies was granted immunity from prosecution, while the Government indicted defendant, this is precisely the kind of decision that

---

[6] Defendant also argues that alleged defects in the search warrant affidavit demonstrate circumstances that give rise to a realistic likelihood of vindictiveness. By Memorandum and Order dated April 9, 2018, the Court rejected defendant's Motion to Suppress.

the Supreme Court has concluded "is particularly ill-suited to judicial review." *Wayte v. United States*, 470 U.S. 598, 608 (1985). The Court declines to require the Government to explain each facet of its investigation and subsequent charging decisions when the underlying basis for his claim—that the prosecutors in this case seek to vindicate defendant's exercise of his First Amendment right to criticize the government when there is no evidence that they knew of or read the articles in question and the articles pertain primarily to prosecutors in a different district—lacks merit.

       c.     *Deficiencies in the Superseding Indictment*

Defendant also argues that the Government's reliance on "convoluted and legally invalid charges" in the Superseding Indictment show a realistic likelihood of vindictiveness.[7] Memo. Supp. Mot. to Dismiss for Vindictive Prosecution at 22. Specifically, defendant asserts that the Government has charged him for conduct outside the relevant statute of limitations. He also asserts that the Government relies on 18 U.S.C. § 2 to hold defendant liable for the actions of others, because as an outside consultant unaffiliated with either the Brady or Moore campaigns, "he cannot be directly liable for either campaign making an unlawful contribution or submitting a false disclosure to the FEC." *Id.* at 3-4.

Defendant has filed a separate motion attacking the Indictment on statute of limitations grounds and accordingly, the Court will address the statute of limitations argument when it rules on that motion. As for defendant's argument that the Government's reliance on 18 U.S.C. § 2 provides further evidence of vindictiveness, the Court disagrees. There is nothing improper about the Government's reliance on 18 U.S.C. § 2 to allege that defendant willfully engaged in certain

---

[7] Defendant filed his Motion to Dismiss the Indictment for Vindictive Prosecution prior to the filing of the Superseding Indictment. Because the Superseding Indictment added new charges related to the Margolies campaign but did not change the allegations with respect to the Brady campaign, those arguments are applicable to the Superseding Indictment.

campaign violations. *See United States v. Curran*, 20 F.3d 560, 567 (3d Cir. 1995) ("Section 2(b) imposes criminal liability on those who possess the *mens rea* to commit an offense and cause others to violate a criminal statute.").

Defendant also argues that the filing of the Superseding Indictment—which added additional charges *after* the he filed his Motion to Dismiss the Indictment for Vindictive Prosecution—provides further evidence of vindictiveness. This argument is unavailing. As an initial matter, defendant deviates from his theory that the Government initiated the instant prosecution in response to a series of critical newspaper articles, instead alleging that the Government filed the Superseding Indictment in retaliation for defendant's filing of the Motion to Dismiss for Vindictive Prosecution. That argument is belied by the record in this case, which shows that the charges added in the Superseding Indictment were the subject of extensive investigation beginning well prior to the filing of the Superseding Indictment. The FBI agents investigating this case prepared an affidavit in support of a search warrant describing the investigation into defendant's conduct with respect to the Margolies campaign, which was signed by the magistrate judge on March 13, 2017, and executed on March 21, 2017. *See, e.g.*, *United States v. Esposito*, 968 F.2d 300, 306 (3d Cir. 1992) ("We will not apply a presumption of vindictiveness to a subsequent criminal case where the basis for that case is justified by the evidence and does not put the defendant twice in jeopardy. . . . [such a rule] would fashion[] a new constitutional rule that requires prosecutors to bring all possible charges in an indictment or forever hold their peace.").

    d.    *Treatment of Alleged Co-Conspirators*

15

Defendant also argues that the Government's failure to indict Brady or Margolies, the candidates at the center of the alleged campaign violations, provides evidence that the Government seeks only to vindicate defendant's exercise of his First Amendment rights. It is well-established, however, that Courts should hesitate to examine the Government's decision to prosecute or not to prosecute. *See Wayte*, 470 U.S. at 607 ("Such factors as the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the Government's overall enforcement plan are not readily susceptible to the kind of analysis the courts are competent to undertake."); *Esposito*, 968 F.2d at 306 ("if the prosecutor has probable cause to believe a crime has been committed and that the accused committed it, the decision whether or not to prosecute and what charges to file generally rests within the prosecutor's broad discretion").

Defendant further states that the three plea agreements entered into by his alleged co-conspirators provide evidence of vindictiveness. Both Cavaness and Moore entered into plea agreements with the USAO for the Eastern District of Pennsylvania by which each agreed to plead guilty to violations of 18 U.S.C. §§ 1001(a)(1) and (2) for false statements arising from a falsification scheme. Memo. Supp. Mot. to Dismiss for Vindictive Prosecution at 20 – 21. Jones pleaded guilty to making a false statement to an FBI agent in violation of 18 U.S.C. §1001(a)(2). *Id.* Cavaness, Moore, and Jones all agreed to cooperate with the government by providing truthful information with respect to the alleged conspiracy. *Id.*, Ex. 36, 37, 38. According to defendant, "the government has forced these three individuals to plea so they will cooperate against the government's primary target, Mr. Smukler." *Id.* at 26. There is no evidence in the record to support defendant's theory that the Government "forced" three innocent individuals to plead guilty to crimes that they did not commit.

*e. Conclusion*

For the aforementioned reasons, the Court concludes that defendant has not met his burden of showing that the circumstances of his indictment reveal a realistic likelihood of vindictiveness to warrant a presumption of vindictiveness.

iii. Discovery

In the alternative, defendant seeks limited discovery on the issue of vindictiveness. The parties disagree on the standard governing discovery; defendant argues that he must only present "some evidence" of vindictiveness to warrant discovery, while the Government asserts that he must present "clear evidence" of vindictiveness. The Court addresses the governing standard and the question whether defendant is entitled to discovery in turn.

The Court agrees with defendant that to obtain discovery on the issue of vindictiveness, defendant is required to advance "some evidence" of a realistic likelihood of vindictiveness. The Third Circuit stated most recently in *United States v. Washington*, that, in the context of selective prosecution, "a successful discovery motion can rest on 'some evidence.'" 869 F.3d 193, 215 (3d Cir. 2017); *see also United States v. Bucci*, 582 F.3d 108 (1st Cir. 2009); *United States v. McKay*, 2013 WL 293002, at *4 (M.D.Pa. June 3, 2013) ("to obtain discovery . . . defendant must provide 'some evidence tending to show the existence of the essential elements of the defense'"). Still, defendant's evidence must be credible. *Id.* And the Supreme Court has made clear that the standard to obtain discovery is nonetheless a "significant barrier to the litigation of insubstantial claims." *Armstrong*, 517 U.S. at 464. Defendant has failed to overcome that barrier.

As stated *supra*, defendant has presented no evidence that anyone in the USAO for the Eastern District read or was aware of the articles at issue or that anyone employed by the Eastern District was somehow implicated in the Porngate scandal. Instead, defendant presents a lengthy

timeline spanning several months, just two articles unrelated to Porngate in which the Eastern District of Pennsylvania and the AUSAs in this case are mentioned, and unsupported allegations that the attorneys in this case forced three other individuals to plead guilty to crimes that they didn't commit in the singular pursuit of defendant. These allegations are not credible and do not meet the "some evidence" standard sufficient to warrant discovery.

Defendant relies on *United States v. Fieger*, No. 07-CR-20414, 2008 WL 205244 (E.D.Mich. January 24, 2008), to assert that the Government's apparent failure to coordinate with the FEC provides some evidence of vindictive prosecution sufficient to entitle him to discovery on the issue of vindictiveness. As the Court stated *supra*, DOJ policy requires that prosecutors consult with the Public Integrity Unit of the DOJ, rather than directly with the FEC. The Government states that such consultation occurred and defendant has presented no evidence to the contrary.

Moreover, the facts in *Fieger* are distinguishable from the facts of this case. In *Fieger*, the district court concluded that the failure of the U.S. Attorney's Office to consult with the FEC before beginning its investigation into alleged campaign violations was just *one* piece of the investigation that was unusual and warranted further discovery. The court also considered that the Government used over 75 FBI agents to conduct a nighttime search of defendants' law offices, that three of the department's top officials recused themselves from the case seven months after the investigation commenced, and that one of the campaign violations investigated by the USAO involved payments directed in opposition to the election of a then-employee of the USAO who was running for the Michigan Supreme Court. *Id*. at *11.

Unlike in *Fieger*, defendant's vindictive prosecution claim rests on a series of newspaper articles in a small publication operated by defendant that are critical of *another* USAO—the

18

Middle District of Pennsylvania—for its failure to appropriately respond to the Porngate scandal. Based on that evidence and the other matters of record, defendant is not entitled to the discovery that he seeks on the issue of vindictive prosecution.

## V.  CONCLUSION

For the aforementioned reasons, defendant's Motion to Dismiss the Indictment for Vindictive Prosecution is denied. The Court declines to permit discovery on the issue of vindictiveness on the record presented.