# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES | CRIMINAL ACTION |
| v. | |
| KENNETH SMUKLER | NO. 17-563-02 |

DuBois, J.                                                                                                                          August 8, 2018

## **M E M O R A N D U M**

## I.     INTRODUCTION

On October 24, 2017, a federal grand jury in the Eastern District of Pennsylvania named defendant Kenneth Smukler and co-defendant Donald "D.A." Jones in a six count Indictment charging violations of the Federal Election Campaign Act ("FECA"). On March 20, 2018, the Government filed a Superseding Indictment charging additional violations of FECA. The Superseding Indictment charges Smukler with: participation in a conspiracy in violation of 18 U.S.C. § 371 (Count I); causing unlawful campaign contributions in violation of 52 U.S.C. §§ 30109(d)(1)(A)(i), 30116(f), and 18 U.S.C. § 2 (Counts II & VII); causing false campaign reports in violation of 52 U.S.C. §§ 30104(a)(1), 30104(b)(5)(A), 30109(d)(1)(A)(i), and of 18 U.S.C. § 2 (Counts III, IV & X); causing false statements in violation of 18 U.S.C. §§ 2 and 1001(a)(1) (Count V & VI); making contributions in the name of another in violation of 52 U.S.C. §§ 30109(d)(1), 30116(f), 30122, and 18 U.S.C. § 2 (Counts VIII & IX); obstruction of a pending agency proceeding in violation of 18 U.S.C. §§ 2 and 1505 (Count XI).

Pending before the Court is Defendant Kenneth Smukler's Motion for an Evidentiary Hearing on the Government's Deliberate Intrusion into Privileged Communications. For the reasons that follow, the Motion is denied.

## II. BACKGROUND

The Superseding Indictment charges defendant with campaign finance violations in connection with two congressional campaigns: (1) the 2012 congressional primary campaign of United States Representative Robert Brady ("Brady") and (2) the 2014 congressional primary campaign of Marjorie Margolies ("Marjorie 2014"). The Court summarized the charges at length in its Memorandum dated July 13, 2018. It does so in this Memorandum only as necessary to explain its rulings. For the purpose of the instant Motion, only those charges related to the Marjorie 2014 campaign are relevant. In connection with that campaign, defendant is charged with facilitating unlawful campaign contributions through two political consulting entities which he owned and disguising those unlawful contributions as refunds of general election contributions.

In April 2014, the campaign learned that one of Margolies's primary opponents, Daylin Leach, had filed a complaint with the FEC ("FEC complaint") alleging that Marjorie 2014 had impermissibly spent general election funds on primary election expenses. Def.'s Mot. for Evid. Hearing, Ex. 2, Leach Complaint. A campaign is prohibited from spending contributions raised for the general election on primary election expenses and must "use an acceptable accounting method to distinguish between contributions received for the primary election and contributions received for the general election." 11 C.F.R. § 109(e)(1). And a candidate who does not prevail in a primary election race is required to refund contributions raised for the general election. 11 C.F.R. § 109(e)(3).

The FEC complaint named Marjorie 2014, Margolies, Jennifer May,[1] and defendant as respondents. In response to the complaint, defendant contacted Karl Sandstrom, an attorney with the law firm Perkins Coie. Def.'s Mot. for Evid. Hearing, at 2. That same day, the Marjorie

---
[1] May was the Marjorie 2014 campaign treasurer.

2014 campaign publicly announced its intention to hire Perkins Coie. *Id.* at 2–3. On April 25, 2014, May signed an engagement letter with Perkins Coie, in which Sandstrom agreed "to represent Marjorie 2014 in connection with Campaign finance advice." *Id.*, Ex. 4, Perkins Coie Engagement Letter, at 1. The engagement letter stated, in pertinent part:

> Our representation of Marjorie 2014 does not include acting as counsel for any entity in which you hold equity or any subsidiary, affiliate, employee, family member or other person (collectively, "Affiliates"), unless such additional representation is separately and clearly undertaken by us. *Id.*

On May 5, 2014, the FEC contacted the Marjorie 2014 campaign to request a response to the Leach's allegations. Def.'s Mot. for Evid. Hearing, Ex. 6, FEC Request for Response. Sandstrom executed a designation of counsel letter on July 11, 2014, and submitted a response to the FEC complaint on July 22, 2014. *Id.*, Ex. 7 & Ex. 8. The FEC ultimately dismissed the Leach complaint in August 2015 based on Sandstrom's representations that the campaign had advanced money to defendant's entities—Black and Blue Media ("BBM") and InfoVoter Technologies ("InfoVoter")—for the purpose of securing services during the general election, and, when Margolies lost the primary election race, BBM and InfoVoter refunded those monies as permitted under 11 C.F.R. §§ 109(e)(1),(3). *Id.*, Ex. 9.

The Government subsequently launched a criminal investigation relating to defendant's activities in connection with the Margolies campaign. On January 30, 2018, Margolies executed a waiver of the attorney-client privilege as to work conducted by Sandstrom on behalf of the Marjorie 2014 campaign. Govt. Opp. to Def.'s Mot. for Evidentiary Hearing, Ex. 8. Specifically, Margolies waived the "attorney client privilege . . . as relating to legal work performed by Karl J. Sandstrom . . . in connection with an FEC filing submitted by Karl Sandstrom on behalf of Ms. Margolies's campaign in 2014 for a seat in the U.S. House of Representatives." *Id.* The waiver also stated that Margolies "does not waive . . . the attorney-

3

client privilege . . . with respect to other work by other lawyers at Perkins Coie, including other work with respect to her 2014 campaign." *Id.*   Pursuant to Margolies's waiver of the attorney-client privilege, the Government interviewed Sandstrom on February 9, 2018. Def.'s Mot. for Evid. Hearing, Ex. 3.

It is Margolies's waiver of the attorney-client privilege and the Government's interview of Sandstrom that give rise to the instant Motion.  Defendant argues that Sandstrom represented the Marjorie 2014 campaign *and* defendant himself and that Margolies lacked the capacity to waive the attorney-client privilege with respect to that representation.  As a consequence, defendant seeks a hearing to show that the Government deliberately intruded into his attorney-client relationship with Sandstrom.

## III.  APPLICABLE LAW

Federal Rule of Criminal Procedure 12(b)(1) requires defendant to raise all "defects in the institution of the prosecution" by pretrial motion. FED.R.CRIM.P. 12(b)(1); *see United States v. Voigt*, 89 F.3d 1050, 1067 (3d Cir. 1996).  To be entitled to an evidentiary hearing on such a motion, "the defendant's moving papers must be 'sufficiently specific, non-conjectural, and detailed to enable the court to conclude that (1) the defendant has presented a colorable constitutional claim, and (2) there are disputed issues of material fact that will affect the outcome of the motion.'"  *United States v. Fattah*, 858 F.3d 801, 810 (3d Cir. 2017) (quoting *United States v. Hines*, 628 F.3d 101, 105 (3d Cir. 2010)). A colorable claim to relief must consist of "more than mere bald-faced allegations of misconduct." *Voigt*, 89 F.3d at 1067.

"[T]o raise a colorable claim of outrageousness pertaining to alleged governmental intrusion into the attorney-client relationship, the defendant's submissions must demonstrate an issue of fact as to each of the three following elements: (1) the government's objective awareness

of an ongoing, personal attorney-client relationship; (2) deliberate intrusion into that relationship; and (3) actual and substantial prejudice. *Voigt*, 89 F.3d at 1067 (citations omitted).

## IV. DISCUSSION

Defendant raises three primary arguments in support of his motion for an evidentiary hearing. As an initial matter, he argues that Margolies lacked the authority to waive the attorney-client privilege on behalf of her campaign, Marjorie 2014. Even if the Court concludes that she did have the capacity to waive the campaign's privilege, defendant asserts that the Government exceeded the scope of the limited waiver, which waived the attorney-client privilege only in relation to Sandstrom's representation in connection with the FEC complaint. Moreover, defendant argues that any waiver with respect to Marjorie 2014 is invalid as to his individual communications with Sandstrom, because defendant had a personal attorney-client relationship with Sandstrom which he has not waived. The Court addresses these arguments in turn.

### A. Whether Margolies had the authority to waive the attorney-client privilege

Defendant argues that Margolies's waiver of the attorney-client privilege was invalid because she lacked the authority to waive privilege on behalf of the campaign. Def.'s Mot. for Evid. Hearing at 7. Instead, defendant asserts, the only individuals with the authority to waive the attorney-client privilege on behalf of the campaign are defendant himself and the campaign treasurer, May.

The parties have not identified—and the Court did not find—case law that specifically addresses the authority to waive the attorney-client privilege on behalf of a political campaign. In the corporate context, the ability to waive attorney-client privilege "rests with the corporation's management and is normally exercised by its officers and directors." *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 348 (1985).

5

Defendant relies on § 52 U.S.C. §30102(e)(2) to support his argument that Margolies lacked the authority to waive the attorney-client privilege on behalf of the campaign. Def.'s Mot. for Evid. Hearing at 7. Section 30102(e)(2) states: "Any candidate . . . who receives a contribution, or a loan for use in connection with the campaign of such candidate for election, or makes a disbursement in connection with such campaign, shall be considered, for purposes of this Act, has having received the contribution or loan, or has having made the disbursement, . . . as an agent of the authorized committee . . . of such candidate." 52 U.S.C. §30102(e)(2). Based on that provision, defendant contends that the candidate is an agent of the campaign only for the limited purpose of receiving contributions, obtaining loans, and making disbursements. The Government argues based on *United States v. Int'l. Bhd. Of Teamsters, Chauffeurs, Warehousemen and Helpers of America, ALF-CIO*, 119 F.3d 210 (2d Cir. 1997), that it is the candidate who has authority to waive the attorney-client privilege and that campaign employees lack the authority to waive the attorney-client privilege.[2]

The Court agrees with the Government that Margolies had the authority to waive the campaign's attorney-client privilege. Contrary to defendant's assertion that the candidate is an agent of the campaign only for the three specific purposes outlined above, FECA contemplates a more expansive role for the candidate. For example, § 30101(5) and (6) define the "principal campaign committee" as "a political committee designated and *authorized by a candidate* under section 30102(e)(1)" and an authorized committee as "the principal campaign committee . . . *authorized by a candidate* under 30102(e)(1) of this title to receive contributions or make expenditures on behalf of such candidate." 52 U.S.C. § 30101(5),(6) (emphasis added). And 52

---

[2] In *Teamsters*, the Second Circuit upheld a candidate's waiver of attorney-client privilege on behalf of a campaign for union president and held that a campaign manager who "reasonably believed" that he was being represented by corporate counsel on an individual basis could not assert the attorney-client privilege.

U.S.C. §30102(e)(1), requires "[e]ach candidate for Federal office . . . [to] designate in writing a political committee . . . ." 52 U.S.C. §30102(e)(1). It is thus the candidate herself who had the authority to establish Marjorie 2014 in the first instance. In addition to establishing Marjorie 2014, Margolies hired defendant and May to work for her campaign. Based on this structure, the Court concludes that Margolies's role is comparable to that of an officer or director of a corporation, while May and defendant are comparable to corporate employees who lack the authority to waive the attorney-client privilege. Defendant's argument that only he or May had the authority to waive the attorney-client privilege on behalf of the campaign has no basis in the statute.

Accordingly, the Court rejects defendant's argument and concludes that Margolies had the authority to waive the attorney-client privilege on behalf of Marjorie 2014.

### B. Whether the Government exceeded the scope of the waiver

Defendant argues that, even if Margolies had the authority to waive the attorney-client privilege with Sandstrom on behalf of Marjorie 2014, the Government exceeded the scope of that privilege because it spoke with Sandstrom about advice he provided prior July 11, 2014—the date on which he executed a designation of counsel form in connection with the FEC complaint. As the Court previously stated, Margolies waived the attorney-client privilege only "as relating to legal work performed by Karl J. Sandstrom . . . in connection with an FEC filing submitted by Karl Sandstrom." Govt. Opp. to Def.'s Mot. for Evidentiary Hearing, Ex. 8. Defendant argues that any advice given prior to the execution of Sandstrom's designation of counsel form was not "in connection with" the FEC filing. The Court rejects this argument.

According to defendant's timeline, the campaign received notice that Leach had filed a complaint with the FEC on or about April 24, 2014. Def.'s Mot. for Evid. Hearing at 3. That

7

same day, defendant called Sandstrom and after that call, the campaign publicly announced that it would retain Perkins Coie. *Id.* at 2–3. On April 25, 2014, May signed the engagement letter retaining Perkins Coie. *Id.* at 3. The engagement letter stated that Sandstrom would provide "Campaign finance advice" for Marjorie 2014. *Id.* It was not until May 5, 2014, —ten days after the campaign retained Perkins Coie—that the FEC requested a response from Marjorie 2014 and not until July 11, 2014, that Sandstrom submitted a designation of counsel form. On July 22, 2014, Sandstrom submitted a response to the complaint. *Id.* On this basis, defendant argues that any communication with Sandstrom prior to July 11, 2014, —the date on which Sandstrom was officially designated as counsel in connection with the FEC complaint—cannot be said to "relat[] to legal work . . . in connection with an FEC filing" submitted by Sandstrom. *Id.* at 9.

The record shows that almost immediately upon receiving notice of the Leach complaint, defendant contacted Sandstrom for advice in connection with that complaint. According to the FBI interview report ("Sandstrom 302 report"), Sandstrom was asked to provide information limited to how and from whom he learned of the Leach complaint against the Margolies campaign and conversations he had with defendant regarding how to ensure compliance with the FEC regulations giving rise to that complaint. There is simply no basis for defendant's argument that those conversations were not "in connection" with the FEC filing later submitted by Sandstrom on behalf of the campaign.

### C. Whether defendant has established that he had an attorney-client relationship with Sandstrom

Defendant asserts that Sandstrom, in addition to representing Marjorie 2014, had a personal attorney-client relationship with defendant. Defendant argues that he has presented a "colorable claim" that the Government intruded into his privileged communications and raised

an issue of fact as to whether the Government was aware of his ongoing personal attorney-client relationship with Sandstrom, deliberately intruded into that relationship, and caused him actual and substantial prejudice. Def.'s Mot. Evid. Hearing at 16 (quoting *Voigt*, 89 F.3d at 1067).

The party asserting the attorney-client privilege bears the burden of establishing that the privilege exists. *In re Matter of Bevill, Bresler & Schulman Asset Management Corp.*, 805 F.2d 120, 124 (3d Cir. 1986). Under Third Circuit law, the attorney-client privilege applies where, *inter alia*,

> (1) The asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court, or his or her subordinate, and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (b) by his client, (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion of law, (ii) legal services, or (iii) assistance in some legal proceeding, and (d) was not for the purpose of committing a crime or tort; and (4) the privilege has been claimed and not waived by the client.

*Montgomery County v. MicroVote Corp.*, 175 F.3d 296, 301 (3d Cir. 1999) (citing *Rhone-Poulenc Rorer Inc. v. Home Indem. Co.*, 32 F.3d 851, 862 (3d Cir. 1994)). The Supreme Court has recognized that "the administration of the privilege . . . presents special problems" where an "inanimate entity" such as a corporation, or in this case, a campaign committee, seeks legal advice because such entities must act through agents. *Bevill*, 805 F.2d at 124 (quoting *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343 (1985)). It is well-settled, however, that "any privilege that exists as to a corporate officer's role and functions within a corporation belongs to the corporation and not the officer." *Id.* at 124.

In *Bevill*, the Third Circuit established a five-part test to distinguish between the corporation's attorney-client privilege and the attorney-client privilege between corporate employees or officers and the corporation's attorney. The Court agrees with the Government

9

that *Bevill* is applicable to this case.[3] *See Teamsters*, 805 F.3d at 215 (applying *Bevill* in the context of union campaign). To assert a claim of attorney-client privilege as to communications with the campaign's counsel, defendant must demonstrate: (1) that he approached counsel for the purpose of seeking legal advice; (2) when he approached counsel, he made it clear that he was seeking advice in his individual rather than in his representative capacity; (3) that counsel saw fit to communicate with him in his individual capacity, despite the possibility that a conflict could arise; (4) that his conversations with counsel were confidential; and (5) that the substance of his conversation with counsel did not concern matters within the campaign or the general affairs of the campaign. *Bevill*, 805 F.2d at 123.

Defendant's evidence of an attorney-client relationship with Sandstrom consists of: (1) the Sandstrom 302 report; (2) an audio recording of an FBI interview with defendant; and (3) representations made by the Government regarding the relationship between defendant and Sandstrom during the course of its investigation. Based on this evidence, the Court concludes that defendant has failed to demonstrate that he had a personal attorney-client relationship with Sandstrom. Instead, the evidence proffered by defendant establishes that he acted on behalf of the campaign in communicating with Sandstrom.

The Sandstrom 302 report does not raise an issue of fact with respect to whether Sandstrom represented defendant in his individual capacity. According to the Sandstrom 302 report, defendant called Sandstrom around April 24, 2014. Def.'s Mot. Evid. Hearing, Ex. 3.

---

[3] Defendant argues that the *Bevill* test should not apply, because he was "not just the general consultant for Marjorie 2014, but also the CEO of his separate companies" and received advice in his capacity as CEO of his separate companies. But defendant has not presented any evidence to suggest that he sought or received legal advice in his capacity as CEO of his entities. To the extent that the advice he received advice related to those entities, the evidence establishes that such advice was incidental to the advice he sought on behalf of the campaign. Defendant also asserts that the *Bevill* test should not apply to his initial conversation with Sandstrom because the campaign did not formally retain Perkins Coie until one day later. However, it is well established that the attorney-client privilege "protects conversations between prospective clients and counsel as well as communications with retained counsel." *Bevill*, 805 F.2d at 125 n. 1 (citing *Baird v. Koerner*, 279 F.2d 623, 635 (9th Cir. 1960)).

Defendant told Sandstrom that "he was the general consultant for the Marjorie Margolies campaign, and that there were allegations being made by an opponent, Daylin Leach, that the Margolies campaign was using contributions that were designated for the general election during the primary election." *Id.* Sandstorm stated he learned that defendant's entities had received a significant amount of money from the campaign. *Id.* Sandstrom later received a spreadsheet detailing Marjorie 2014 funds, which showed that the campaign lacked sufficient cash on hand as required by 11 C.F.R. 109(e)(2). *Id.* According to Sandstrom, this shortage was "a result of the money paid to Smukler's companies." *Id.* Sandstrom advised defendant that he could "fix the out of balance by reducing his soft costs or profit." *Id.*

Sandstrom's advice did indeed pertain to defendant's entities—BBM and InfoVoter. However, Sandstrom's knowledge of defendant's entities was limited to information related to the campaign. For example, Sandstrom stated that he learned the campaign's funds were out of balance because of money it had paid to defendant's entities, but he did not know how defendant's entities used the money that those entities received from Marjorie 2014. Sandstrom's advice pertained to defendant's entities only inasmuch as necessary to ensure the campaign's compliance with FEC regulation. *See Bevill*, 805 F.2d at 123 (rejecting contention that "because [corporate officers'] personal legal problems were inextricably intertwined with those of the corporation, disclosure of discussions of corporate matters would eviscerate their personal privileges"). Based on these facts, defendant has failed to establish that he sought legal advice in his individual capacity, rather than as a representative of the campaign seeking legal advice on behalf of Marjorie 2014.

Defendant also submits the audio recording of his interview with the FBI as evidence that he had a personal attorney-client relationship with Sandstrom. Specifically, he contends that

11

based on the audio file, Sandstrom will testify that "their communications included conversations about whether Mr. Smukler and his companies should undertake certain payments" and the liabilities and exposure of those entities. The Court disagrees. It is true that during the course of the interview, defendant refers to Sandstrom as "my lawyer" on a few occasions. However, the context of those conversations and other statements made by defendant fail to support his contention that he had an attorney-client relationship with Sandstrom.

For example, in response to a question about whether the campaign impermissibly spent general election funds on primary election expenses, defendant stated: "when it was raised that there was an issue, I talked to *our* FEC lawyer, Karl Sandstrom, Perkins Coie, right. I said Karl, *we* have this issue with money going out, I said how do *we* resolve that? He says: make sure that whatever money that has come into Black and Blue can come back." Def.'s Ex. 15, 28:55–29: 17. Defendant also told the FBI that he refunded all the money that needed to be refunded, based on Sandstrom's advice, "*in order to comply with all FEC laws*." *Id.* at 29: 20–29:36. Later in the conversation, defendant revisited this point stating, "someone had filed a complaint, I talked to *our* lawyer." *Id.* at 31:32 – 31:41. Defendant also stated that he communicated almost daily with Margolies to update her with respect to the FEC complaint and that he "said [he] was resolving it with Karl, my lawyer—with *our lawyer, the campaign lawyer*." *Id.* at 36:55 – 37:24. Thus, notwithstanding the fact that defendant referred to Sandstrom as "my lawyer" on occasion when speaking with the FBI, defendant's statements make clear that he was in contact with Sandstrom as a campaign representative for the purpose of responding to the FEC complaint and ensuring the campaign's compliance with FEC regulations.

Defendant also argues that the Government recognized that he had a personal attorney-client relationship with Sandstrom during the course of its investigation and initially took

precautions to avoid intruding into the attorney-client privilege. Specifically, defendant points to a discovery letter submitted by the Government in which it stated that, in conducting searches of defendant's laptop and email account, "law enforcement filtered the contents for any communications with Karl Sandstrom, Esq." and that "[n]o member of the investigative team has viewed any privileged communications to or from Mr. Smukler." Def.'s Mot. Evid. Hearing, Ex. 10. That the Government took precautions to avoid viewing potentially privileged materials, prior to learning the nature of defendant's relationship with Sandstrom does not support defendant's contention that he had a personal attorney-client relationship with Sandstrom.[4]

At the very least, defendant argues, the above-described evidence shows that he had an implied attorney-client relationship with Sandstrom. Courts have found an implied attorney-client relationship where: "(1) the alleged client sought legal advice and assistance from the alleged attorney; (2) the advice sought was within the professional competence of the alleged attorney; (3) the alleged attorney agreed, either expressly or by implication, to provide such advice; and (4) the alleged client reasonably believed that the alleged attorney was representing the alleged client." *In re Jones & McClain, LLP*, 271 B.R. 473, 477 – 478 (W.D. Pa. 2001). The Court rejects this argument.

While defendant sought legal advice from Sandstrom, the evidence shows that he sought that legal advice on behalf of and as a representative of the Marjorie 2014 campaign. There is no evidence that Sandstrom agreed—either expressly or by implication—to provide legal advice to defendant in his capacity as CEO of BBM and InfoVoter. And although the advice given necessarily implicated defendant's personal entities, the record is clear that it did so only for the purpose of ensuring the Marjorie 2014 campaign's compliance with FEC regulations. Moreover,

---

[4] The same is true for any statements made by the FBI during the course of their interview of defendant. The fact that the agents took precautions to avoid potential issues of attorney-client privilege when defendant mentioned an attorney does not create an attorney-client relationship between defendant and Sandstrom.

13

the evidence with respect to the fourth prong of the test is insufficient. Although defendant now claims that he believed Sandstrom represented him in a personal capacity, defendant's argument is belied by statements he made to the FBI in which he refers to Sandstrom as "the campaign lawyer" and states that he contacted Sandstrom to obtain advice with respect to the FEC complaint.

### D. CONCLUSION

For all of the foregoing reasons, defendant's Motion for an Evidentiary Hearing on the Government's Deliberate Intrusion Into Privileged Communications is denied. An appropriate order follows.