## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | CRIMINAL NO.  17-00563-JD |
| | : | |
| KENNETH SMUKLER | : | |

### UNITED STATES' TRIAL BRIEF

The United States of America, by and through undersigned counsel, respectfully submits this brief to provide a guide for the Court regarding the evidence the United States will offer at trial and to preview several legal issues that may arise.

### I.    Background

#### A.  Facts

The evidence at trial will show that the defendant, Kenneth Smukler, engaged in two schemes by which he, working with others, used similar methods to willfully circumvent federal campaign finance limits, and to defeat transparency and obstruct justice in the campaign finance process as administered by the Federal Election Commission ("FEC").   The government anticipates that three cooperating witnesses, who have all pled guilty for their roles in one of the schemes, will testify at trial.

#### 1.  *Bob Brady for Congress Scheme*

In the 2012 Democratic primary election for Pennsylvania's First Congressional District, Jimmie Moore, a former Philadelphia Municipal Court Judge, ran against the incumbent, Robert Brady.  As alleged in the Superseding Indictment, and as the evidence at trial will show, Moore struck a deal by which he agreed to withdraw from the race in exchange for funds from the Bob Brady for Congress campaign to be used to pay off Moore's campaign debts.  Those debts included

money that Jimmie Moore for Congress (the "Moore campaign") owed to several vendors, to Moore himself, and to Carolyn Cavaness, who was Moore's campaign manager.

On February 29, 2012, Moore withdrew from the race.  Moore and Cavaness subsequently prepared a list of debts owed by the Moore campaign.  Evidence at trial will show that Moore provided a copy of this list to the defendant, and that the two sides eventually agreed that the Moore campaign would receive $90,000 from the Brady campaign.  Testimony will establish that, at a meeting to discuss the transfer of funds, the defendant told Moore that the $90,000 would be paid in three installments:  two payments from the defendant's company *disguised* as the purchase of a poll—*a poll that the Brady campaign already possessed*—and one from another Brady operative *disguised* as a payment for consulting work purportedly done by Cavaness (which never occurred).  Bank records show three payments from the Brady campaign to Cavaness via the defendant and via Donald "D.A." Jones (a fellow political consultant who also worked on the Brady campaign[1]) in the months after Brady prevailed in the primary.  Evidence at trial will establish not only that the defendant met with Moore and directed the scheme, but also that he contacted Cavaness himself to arrange the payments and fraudulent invoicing to conceal the true nature of the payments.

### i.    First Unlawful Campaign Contribution

The first payment was a June 11, 2012, check in the amount of $40,000 from the Brady campaign to Voter Link Data Systems ("VLDS"), a political consulting company run by the defendant.  On July 13, 2012, the Brady campaign filed a FEC report that stated this payment was

---

[1]      Jones, a cooperating witness, was also involved in the defendant's scheme involving the Margolies campaign, as described below.

an expenditure to VLDS for "Survey and Polling Services."[2]  On June 13, 2012, two days after receiving the money, VLDS wrote a check to Cavaness in the amount of $40,000, which she deposited in her personal bank account.  The subject line of the check stated: "Poll."  The check was signed by the defendant.

Records show that Cavaness used approximately half of these funds to repay Moore a portion of the money that Moore had lent his own campaign.  Between June 18, 2012, and July 7, 2012, Cavaness wrote several checks to Moore, totaling $19,500.  Each of these checks had the word "reimbursement" written in the subject line.  The rest of the funds from this first payment remained in Cavaness' personal bank account.

Evidence at trial will establish that the defendant, working with others, sought to disguise the first and second payments from the Brady campaign as the purchase of a poll to conceal the fact that Brady campaign funds had been used to pay his opponent's debts.  The poll at issue was commissioned by Moore a year earlier, in February 2011, to analyze the primary matchup between himself and Brady.  However, witnesses and corroborating documents will establish that the Brady campaign had already obtained the poll *and* the underlying data long before the defendant cooked up the scheme to have the campaign supposedly purchase them from Cavaness.  In other words, that purchase took place in June 2012, over a month *after* Brady won the primary, and over three months *after* Moore, the opponent that was the subject of the poll, withdrew from the race.  This meant that the poll was useless by the time the purchase scheme was enacted.  Moreover, the Brady campaign purportedly purchased this poll, which it already had, for more than *twice* the

_____

[2]        Under the Federal Election Campaign Act, a contribution is essentially anything of value, other than specified exceptions, to influence a federal election.  52 U.S.C. §30101(8).  Further, the FEC has particularly noted that items prepared specifically for a political campaign to be used in the campaign—for example, opinion polls—are "contributions" to another campaign, and therefore must not come from a prohibited source (for example, not a corporation or labor union) and must further be within the contribution limits from any legal source.  *See* https://www.fec.gov/help-candidates-and-committees/winding-down-candidate-campaign/sale-campaign-assets/.

approximately $34,000 Moore originally paid for it in early 2011, at a time when Moore was running and the information was actually relevant.

### ii.    Second Unlawful Campaign Contribution

On July 10, 2012, a month after the first payment, the Brady campaign wrote another check to VLDS, this one in the amount of $25,000.  The Brady campaign filed an FEC report on October 15, 2012, stating that this second payment was an expenditure to VLDS for "Acquisition of Cross Tabs."[3]  On July 17, 2012, one week after receiving the money from the Brady campaign, VLDS wrote a check to Cavaness in the amount of $25,000, which she again deposited in her personal bank account.  The defendant also signed this check.

Records show Cavaness spent some of the VLDS money on personal expenses for herself and Moore.  Cavaness also used $13,000 of that money to open a bank account for CavaSense and Associates ("CavaSense").  Evidence at trial will show that the defendant instructed Moore to create a shell company to receive the Brady campaign funds.  As a result, and at Moore's direction, Cavaness created CavaSense in June 2012.  Cavaness later used the funds in the CavaSense account to repay campaign vendors, including herself.  The government's evidence will show the *sole* purpose of CavaSense was to serve as a cut-out to receive and conceal the Brady campaign funds funneled through the consulting companies run by the defendant and Jones.

Testimony at trial will establish that the defendant told Cavaness to create an agreement and invoices for the "sale" of a poll to VLDS by CavaSense.  Per the defendant's instructions, Cavaness created an agreement stating that CavaSense would sell the rights to the 2011 poll—which CavaSense did not own—to VLDS, as well as two invoices stating that VLDS would make two payments to CavaSense: $40,000 for the poll itself and $25,000 for the cross-tabs associated

---

[3]    "Crosstabs" is a term that refers to a breakdown of the responses in a poll that can be generated from the raw data.

with the poll.  Evidence at trial will demonstrate that the purpose of these documents was to create a fake justification for the transfer of funds from the Brady campaign, as discussed above.

### iii.    Third Unlawful Campaign Contribution

The third payment from the Brady campaign came on August 23, 2012, when the campaign wrote a $25,000 check to D.A. Jones and Associates, a political consulting company run by Jones. In its October 15, 2012, report filed with the FEC, the Brady campaign stated that this payment was an expenditure to D.A. Jones and Associates for: "Consultant."  On August 30, 2012, one week after receiving the funds, D.A. Jones and Associates sent a $25,000 check to CavaSense, with the word "consulting" in the memo line.  Jones signed this check.

Testimony at trial will show that Jones contacted Cavaness and directed her to create an invoice stating that D.A. Jones and Associates would pay CavaSense $25,000 for consulting services.  Jones will testify that the defendant directed him to make the payment to Cavaness, even though Jones knew very well that Cavaness had not done, and would never do, work justifying the payment.  Cavaness will also testify that she never did any work for Jones or for the Brady campaign; rather, the purpose of the invoice was simply to further disguise the third payment.

Cavaness deposited this $25,000 check into the CavaSense account on September 4, 2012. On that same day, she wrote checks to several vendors who were owed money by the Moore campaign, and she also wrote two checks to her personal account.

### iv.    Summary of Conduct

Between June 2012 and August 2012, the defendant caused $90,000 to be transferred from the Brady campaign to Cavaness and her company for the benefit of the Moore campaign.  Of that amount, $21,000 was used to pay vendors owed money from the Moore campaign, and $19,500

was paid to Moore in checks labeled as "reimbursement." Cavaness and Moore spent the remainder of the money on personal expenses.

To conceal the scheme, none of those payments of the Moore campaign debts were ever reported on the campaign finance reports that the Moore campaign filed with the FEC after the primary election ended. Those reports, which were filed in October 2012 and in June 2013, listed no payments on the debts to the vendors, to Cavaness, or to Moore. Instead, the reports falsely listed the same debts that had appeared on earlier campaign finance reports, notwithstanding the fact that those debts had since been repaid with the funds from the Brady campaign. Nor did the Moore campaign finance reports accurately reflect the receipt of funds from the Brady campaign, VLDS, or D.A. Jones and Associates. Indeed, as noted above, the Brady campaign's FEC reports reflect only the payments to the defendant and Jones, with no reference to Moore, Cavaness, or CavaSense.

The evidence at trial will prove that the defendant and his co-conspirators sought to disguise the fact that the Brady campaign illegally used campaign funds to pay an opponent to withdraw from a race. In so doing, the defendant not only caused unlawful, excessive campaign contributions, but also caused the two campaigns to file false reports with the FEC, and engaged in a falsification scheme with respect to administration of matters before the FEC, namely the collection and publication of accurate information about the Moore and Brady campaigns.

## 2. *The Marjorie 2014 Scheme*

Marjorie Margolies, a former Member of the United States House of Representative, ran in the 2014 Democratic primary election for Pennsylvania's Thirteenth Congressional District. Evidence at trial will establish that it was the defendant who directed her campaign committee, Marjorie 2014 (the "Margolies campaign"), and that he committed criminal offenses in concealing

the fact that he caused the Margolies campaign to illegally spend general election funds in his desperate, unsuccessful effort to win the primary election for his candidate.

Bank records show that, between June 1, 2013, and April 1, 2014, the Margolies campaign paid a total of $210,750 to two of the defendant's companies: Black and Blue Media ("Black and Blue") and InfoVoter Technologies ("InfoVoter"). The campaign's FEC reports listed these expenditures for the primary election. As discussed in more detail below, bank records show that the defendant's companies spent nearly $100,000 of the money received from the Margolies campaign on payments for goods and services provided in connection with the primary campaign.

Evidence at trial will further show that, by early April 2014, the Margolies campaign was running out of money that it could legally spend in the primary. Specifically, an internal email reveals that, on April 1, 2014, the defendant was advised that the Margolies campaign had $142,939 in its bank account but had received $143,477 in contributions designated for the general election.[4] In other words, the campaign could not spend any more money on primary election expenses because all the money in the campaign bank account had to be set aside to refund general election contributions in case Margolies lost the primary.

*i.    First Transaction: The $78,750 Payment*

As the primary campaign neared the finish line, the Margolies campaign's lack of primary election funds created a problem for the campaign. The defendant and the campaign had planned to purchase television advertisements in the final weeks before the primary. On April 29, 2014, the defendant emailed Jennifer May, Treasurer of the Margolies campaign: "I will be wiring

---

[4]     Federal law allows individuals to a make a contribution to a particular campaign committee up to a designated limit for each election in a cycle, which is usually one primary and one general election. During the primary, campaigns are allowed to accept contributions designated for the general election, so long as the general election contributions are not spent on the primary campaign. If the candidate does not win the primary election, the campaign must refund general election contributions received during the primary. But, if the candidate does win the primary, the campaign is free to spend the general election contributions on costs associated with the general election.

$78,750 of the segregated media account funds into the campaign media account on may 1 . . . on may 2, will need to wire these funds out of campaign to [the company producing the advertisement], along with $65,000 from the campaign account."  Testimony at trial (free of any privilege issue) will establish that the defendant sent this email the day after counsel for the Margolies campaign advised the defendant not to make any further payments on primary election expenses using campaign funds, and emphasized that the campaign was *not* permitted to spend general election funds on primary election expenses.  Moreover, there was no "segregated media account," as the defendant well knew.

To circumvent this prohibition, the defendant found the funds elsewhere.  Bank records show that on May 2, 2014, the defendant wired $78,750 from his brokerage account to Black and Blue's bank account, and, on May 5, 2014, wired the same amount from Black and Blue's bank account into a new bank account for the Margolies campaign.  The following day, the defendant wired $78,750 from the new campaign account to the company producing the television advertisement.  The day after that, the defendant's brother wired $75,000 to the defendant's brokerage account.  Testimony at trial will establish that the defendant asked his brother, Andrew Smukler, for money specifically to assist the Margolies campaign.  The evidence will also show that, without the $78,750 wire from the defendant's brokerage account, Black and Blue would not have had sufficient funds to cover the $78,750 wire to the campaign account.

In a campaign finance report filed with the FEC on July 15, 2014, the Margolies campaign stated that the $78,750 transfer from Black and Blue to the campaign account was: "Refund of Media Account."  The defendant caused May to prepare and sign this report.  Testimony at trial will establish that May designated this payment as a "refund" based on the defendant's

representations to her and that, had she known that the $78,750 came from the defendant's brother rather than a "media account," she would not have submitted the report to the FEC.

*ii.     Second and Third Transactions: The $78,750 Payment*

Internal emails and testimony will show that, in May 2014, the defendant continued to instruct May to use campaign funds to pay for primary election expenses, notwithstanding May's own warnings to the defendant that the campaign had exhausted its primary funds, and that any further payments would dip into general election funds.

On May 20, 2014, Margolies lost the primary election. While the Margolies campaign thus needed to refund general election contributions that it had received during the primary, the evidence will show that the campaign could not refund the approximately $158,000 in general election contributions because the campaign had spent nearly all of that money illegally on primary election expenses. In June 2014, May emailed the defendant several times asking him whether the candidate, Margolies, would agree to give money to the campaign to make up this shortfall, which would have been a legal method to replenish the general election funds.

The defendant, however, had another idea. On July 3, 2014, he emailed May to ask "exactly what amount infovoter and blackblue need to return to the campaign to reconcile all general fund contributions." The defendant further stated, "I intend to transfer next week thx." On July 9, 2014, May wrote to the defendant: "We need Marjorie's money in the account ASAP to get the account positive. If it is not positive for the report due next week, we are all in really big trouble. Please let me know when she'll be putting in the money." Four minutes later, the defendant falsely responded: "The money will be transferred in the next couple days . . . the campaign did not spend the general money as it was escrowed in infovoter and is being refunded by infovoter to the campaign upon the demand of the campaign." Testimony at trial will confirm

this email from the defendant was the first time May heard anything about campaign funds being "escrowed" in the defendant's companies.

Bank records show that, on the same day as the email exchange described above, Kevin Morgan, a friend of the defendant, wired $150,000 to the defendant's brokerage account at the defendant's request.  Two days later, on July 11, 2014, the defendant wired $110,000 from his brokerage account to InfoVoter, and also wired $40,000 from that account to Black and Blue.  On July 14, 2014, $110,000 from InfoVoter and $40,000 from Black and Blue were wired to the Margolies campaign's bank account.  The campaign began to refund general election contributions two days after receiving these wire transfers, which enabled the refunds.  Evidence at trial will establish that without the $150,000 wire from Morgan, the defendant would not have been able to fund the wires from his brokerage account to InfoVoter and Black and Blue.  The evidence also will establish that without the wires from the defendant's brokerage accounts, the defendant's companies would not have been able to fund their wires to the campaign account.

In a campaign finance report filed with the FEC on October 15, 2014, the Margolies campaign falsely described the $40,000 transfer from Black and Blue as "Refund of Media Account," and the $110,000 transfer from InfoVoter as "Refund."  May unwittingly signed the report, and testimony at trial will confirm that she made these entries based on the information provided to her by the defendant in the emails referenced above.

On the whole, records demonstrate that, between April 2014 and July 2014, the defendant's companies frantically "refunded" the Margolies campaign a total of $228,750, which was $18,000 more than the campaign had paid InfoVoter and Black and Blue in the first place, and which was never truthfully a "refund" of held funds at all.

### iii.    FEC Proceedings

In April 2014, one of Margolies' primary opponents filed a complaint with the FEC, correctly alleging that the Margolies campaign had spent general election funds on primary election expenses.  The complaint noted that the Margolies campaign's FEC reports showed that, in the first quarter of 2014, the campaign's cash on hand was less than the sum of general election contributions received.

On July 22, 2014, the defendant caused counsel for the campaign, Karl Sandstrom, to unwittingly write a false letter to the FEC arguing that the complaint should be dismissed.  That letter was based upon the defendant's lies.  In that letter, Sandstrom stated:

> The [Margolies campaign] agreed to advance a portion of [its general election] funds to its principal campaign vendors in order to secure their services, availability and commitment for the general election.  The advanced funds would be available to pay for general election media and consulting expenses of the vendors.  The funds were advanced on the condition that they would be refunded to the committee if the candidate did not secure the nomination.  The vendors accepted the funds subject to this condition and have refunded the advanced payments to the committee.

These false representations from the defendant in Sandstrom's letter were consistent with the Margolies campaign's FEC reports discussed above, which also falsely described the payments from the defendant's companies as "refunds," and were also willfully caused by the defendant.  Indeed, both witness accounts and internal emails will confirm that the defendant reviewed a draft letter from counsel setting forth this false explanation before it was filed.  The FEC subsequently dismissed the complaint based upon the false representations made in Sandstrom's letter that communicated the defendant's lies.

Evidence at trial will establish that the "refund" explanation concocted by the defendant and set forth in Sandstrom's letter, as well as in the Margolies campaign's FEC reports, was entirely false.  Bank records and witness accounts confirm that the defendant's companies spent

nearly $100,000 of the funds received from the campaign on hard costs associated with the primary election—that is, costs for goods and services provided to the campaign.  The records from the defendant's companies show that, other than the payments to vendors for those hard costs, the remainder of the funds that InfoVoter and Black and Blue received from the Margolies campaign were used to pay miscellaneous expenses, like the defendant's credit card bills, or were transferred to the defendant's personal bank account or the accounts of his other companies, rather than held in any supposed escrow, trust, segregated fund, or the like.

Because the defendant's companies had already spent at least a portion of the money they received from the campaign on hard costs associated with the primary election, the payments from the companies to the campaign could not be "refunds" of general election expenses.  And, as discussed above, those funds were not "escrowed," and they did not come from a "segregated media account."  Instead, the defendant's payments to the campaign were funded by money he requested and received from his brother and his friend, which constituted illegal and excessive campaign contributions.

<em>iv.    Fourth Transaction: The $2,600 Conduit Contribution</em>

On May 16, 2014, Jones received a $2,600 check from InfoVoter.  The government's evidence establishes that this check was an illegal reimbursement for a $2,600 conduit contribution that Jones made to the Margolies campaign in his wife's name.  Testimony at trial will show that the defendant told Jones to make that contribution on the promise that Jones would be reimbursed for it.

<em>v.    Fifth Transaction: The $23,750 Conduit Contribution</em>

As discussed above, the defendant's companies frantically "refunded" the Margolies campaign $18,000 more than the companies received from the campaign in the first place.  The

12

FEC noticed this discrepancy and, on March 4, 2015, sent a letter to May noting that the "refunds" reported to InfoVoter on the campaign's FEC reports "exceeded the payments made to the vendor." On March 31, 2015, May responded to the FEC by email that this error was the result of a miscommunication, and had been remedied by a payment of $18,000 from the campaign to InfoVoter.

The campaign's FEC reports show that this $18,000 payment to InfoVoter put the campaign in debt. Evidence at trial will show that, to get the campaign out of debt, the defendant provided Margolies herself with money to give to the campaign. On June 30, 2015, several months after the $18,000 payment from the Margolies campaign to InfoVoter, a $25,000 check from the defendant's Black and Blue account was deposited in Margolies' personal bank account. On July 1, 2015, Margolies transferred $23,750 from her personal bank account to the campaign account. Evidence at trial will show that Margolies followed the defendant's instructions with respect to these payments.

On October 15, 2015, the Margolies campaign, as a result of the defendant's machinations, then filed a report with the FEC falsely characterizing the $23,750 payment as a loan from Margolies to the campaign. As of the campaign's last filing on December 31, 2017, the so-called "loan" was still outstanding.

The government's evidence establishes that the defendant willfully caused excess contributions to the Margolies campaign, made conduit (a/k/a straw) contributions to the Margolies campaign, caused the Margolies campaign to file false expenditure reports with the FEC and make false statements to the FEC, and obstructed an FEC proceeding.

### B.  Proof

The United States will argue at trial that the facts set forth above prove beyond a reasonable doubt that the defendant is guilty of all of the substantive crimes charged in Counts Two through Eleven of the Superseding Indictment, together with the conspiracy to commit Counts Two through Four charged in Count One.[5]

#### 1.  Excessive Contributions

The Federal Election Campaign Act (the "Election Act") prohibits contributions to a candidate's authorized political campaign committee in excess of a statutory limit.  52 U.S.C. § 30116(a)(1).[6]  The statute expressly provides that contributions made through an intermediary are treated as contributions from the original payor, 52 U.S.C. § 30116(a)(8), and, that "[n]o person shall make a contribution in the name of another person . . . and no person shall knowingly accept a contribution made by one person in the name of another person."  52 U.S.C. § 30122.  Moreover, anyone who "willfully causes an act to be done which if directly performed by him or another would be" a federal offense "is punishable as a principal."  18 U.S.C. § 2(b).

The Election Act makes it a felony to "knowingly and willfully commit[] a violation of any provision" related to "the making, receiving, or reporting of any" contribution, donation, or expenditure aggregating $25,000 or more in one calendar year.  52 U.S.C. § 30109(d)(1)(A)(i).

---

[5]    Count One charges a multiple object conspiracy in which the conspirators agreed to 1.) make excessive contributions, 2.) cause false reports to be filed with the FEC in order to conceal the excessive contributions, 3.) scheme to deceive a federal agency about the excessive contributions, and 4.) falsify records to further the scheme. "It is well established that where a statute may be violated by multiple means, the government may charge the alternatives in the conjunctive (using the word "and").  In other words, where the statute says "or" the indictment should be pleaded as 'and' and may be proven as 'or.'" Federal Grand Jury Practice § 11.15. *See also Musacchio v. United States*, 136 S.Ct. 709 n.2 (2016) ("[W]e do not suggest that the Government adds an element to a crime for purposes of sufficiency review when the indictment charges different means of committing a crime in the conjunctive."); *United States v. Facen*, 2016 WL 471903 (2d Cir. Feb. 8, 2016).

[6]    For the 2012 election cycle, the statutory contribution limit for individuals was $2,500 per election.  For the 2014 election cycle, the statutory contribution limit was $2,600 per election.

To satisfy this willfulness requirement, the United States must prove that the defendant acted with the knowledge that some part of his course of conduct was unlawful. *See Bryan v. United States*, 524 U.S. 184, 191–92 (1998); *see also United States v. Benton*, 890 F.3d 697, 715 (8th Cir. 2018); *United States v. Whittemore*, 776 F.3d 1074, 1080–81 (9th Cir. 2015); *United States v. Whittemore*, 944 F. Supp. 2d 1003, 1010 (D. Nev. 2013), *aff'd*, 776 F.3d 1074 (9th Cir. 2015); *United States v. Danielczyk*, 788 F. Supp. 2d 472, 493 (E.D. Va. 2011), *reversed in part on other grounds*, 683 F.3d 611 (4th Cir. 2012).

Count Two of the Superseding Indictment charges that the defendant, aided and abetted by others, caused the Brady campaign to make excessive contributions to the Moore campaign aggregating more than $25,000 in calendar year 2012.  This excessive contribution came via three specific, aggregating payments s to the Moore campaign: (1) the June 2012 payment of $40,000 from VLDS to Cavaness, (2) the July 2012 payment of $25,000 from VLDS to Cavaness, and (3) the August 2012 payment of $25,000 from D.A. Jones and Associates to CavaSense.  The limit for a contribution from one campaign committee to another is $5,000 in an entire two-year election cycle.  52 U.S.C. § 30116(a)(C).

Nevertheless, the defendant caused each of these payments by the Brady campaign through *concealing* intermediaries.  Therefore, they are a willfully excessive, aggregate contribution from the Brady campaign under Section 30116(a)(8), for a total of an $85,000 excessive contribution (i.e., $90,000 in contributions less the $5,000 permitted by the Election Act without reference to related reporting offenses) in calendar year 2012.  *See generally*, *United States v. O'Donnell*, 608 F.3d 546, 550 (9th Cir. 2010) (explaining that the Election Act's "language applies when a defendant's funds go to a campaign either directly from him or through an intermediary").

Count Seven similarly charges an excessive aggregate contribution by the defendant himself to the Margolies campaign for the general primary and general elections aggregating over $25,000 in calendar year 2014. The excessive contribution is comprised of two *concealed* payments he caused in that year: (1) the May 2014 payment of $78,750 from Black and Blue, and (2) the July 2014 payment of $110,000 from InfoVoter. Therefore, the aggregate excessive amount was $188,750.00 (with no credit for allowable personal contributions because the primary election had passed, and the candidate withdrew from the general election). As discussed in detail above, those payments were not (as the defendant caused the Margolies campaign to report to the FEC) refunds of advance payments for general election expenses. Rather, they were unlawful contributions from the defendant to the Margolies campaign.

### 2. *Conduit Contributions*

The Election Act also states that "[n]o person shall make a contribution in the name of another person." 52 U.S.C. § 30122. This provision prohibits conduit contributions—that is, contributions for which the nominal donor receives an advance or is reimbursed. *See, e.g.*, *United States v. Boender*, 649 F.3d 650, 660 (7th Cir. 2011); *O'Donnell*, 608 F.3d at 549.

Here, the Superseding Indictment further charges that the defendant made two different conduit contributions: Count Eight charges one conduit contribution through Jones for $2,600, and Count Nine charges another one through Margolies for $23,750.[7] In both instances, the nominal contributor was told by the defendant that he would pay for the contributions, which were then made to the Margolies campaign and reported to the FEC in the names of Jones and Margolies

---

[7]     Loans are contributions under 52 U.S.C. §30101(8). The United States notes that candidates can certainly loan unlimited amounts of their own money to their campaign as such a contribution. However, candidates cannot loan another person's money in the name of the candidate, nor may others willfully cause to do so, without contributing in the name of another.

respectively.[8]  Count Eight is a misdemeanor for conduiting in calendar year 2014.  52 U.S.C. § 30109(d)(1)(A)(ii).  Count Nine is a two-year felony for conduiting in 2015 under the special statutory provision Congress has provided for conduit contributions.  52 U.S.C. § 30109(d)(1)(D).

### 3.  Causing False FEC Reports

The Election Act requires political committees to file reports with the FEC documenting the committee's contributions and expenditures.  52 U.S.C. § 30104(a)(1). The reports of receipts by a political committee must include the identification of each person who makes a contribution to the committee.  52 U.S.C. § 30104(b)(3)(A).

The Election Act makes it a crime to "knowingly and willfully commit[] a violation of any provision" related to the "making, receiving, or reporting of any" contribution or expenditure.  52 U.S.C. § 30109(d)(1)(A)(i).  Here again, the *Bryan* standard of willfulness applies.

As alleged in Counts Three and Four of the Superseding Indictment, the defendant, working with others, caused the Brady and Moore campaigns to file false reports with the FEC in order to conceal the payments to Cavaness and CavaSense.  Because the conspirators routed the three payments through the defendant's and Jones' companies, the campaign finance reports filed by the Brady campaign with the FEC did not mention that Moore was the true recipient of the three payments described above.  And because the conspirators disguised the payments as the purchase of a poll and consulting services, the Brady campaign reports did not show that the true purpose of the payments was to pay off Moore in exchange for his agreement to withdraw from the primary.  Similarly, by routing the payments through the consulting companies to a shell company and to Cavaness herself, the defendants caused the Moore campaign to file reports with the FEC that did

---

[8]     The government will call Ms. Margolies to the stand who is expected to testify that the defendant (falsely) assured her this arrangement was legal within the applicable provisions of the Election Act.

not mention the three payments from the Brady campaign.  Nor did the Moore campaign finance reports a list any payments on the debts to the vendors, to Cavaness, or to Moore.

The Superseding Indictment further alleges in Count Ten that the defendant committed a crime by knowingly and willfully causing the Margolies campaign to file false FEC reports with respect to certain expenditures.  The defendant caused the campaign to report payments from his companies as refunds and also to report contributions from the defendant in the names of others.

### 4.  *False Statement Schemes in Federal Jurisdiction*

Section 1001(a) makes it a crime to "knowingly and willfully falsif[y], conceal[], or cover[] up by any trick, scheme, or device a material fact" that relates to "any matter within the jurisdiction" of the federal government.  The Third Circuit has recognized that this statute applies to false statements on campaign finance reports filed with the FEC.  *United States v. Curran*, 20 F.3d 560, 566 (3d Cir. 1994).

In Counts Five and Six, the Superseding Indictment alleges that the defendant knowingly and willfully schemed to cause the Moore and Brady campaigns to conceal or cover up the payments to the Moore campaign by routing those payments through VLDS and D.A. Jones and Associates with false descriptions.  These payments were material to the FEC's statutory function to obtain and publish accurate reports of campaign contributions and expenditures.

The defendant also caused the Margolies campaign to make particular false statements to the FEC to disguise a number of unlawful contributions.  Count Six identifies three false statements on campaign finance reports, and a false statement in a letter to the FEC written by Sandstrom. These payments were also material to the FEC's statutory function to obtain and publish accurate reports of campaign contributions and expenditures.

### 5.    *Obstruction of Justice*

Count Eleven charges a violation of 18 U.S.C. § 1505, which makes it a crime to "corruptly . . . endeavor[] to . . . obstruct or impede the due and proper administration of the law under which any pending proceeding is being had before any department or agency of the United States."  The term "proceeding" encompasses both the investigative and adjudicative functions of a federal agency.  *United States v. Leo*, 941 F.2d 181, 199 (3d Cir. 1991).  The Third Circuit has recognized that providing false information in connection with a pending investigation constitutes a violation of Section 1505.  *United States v. Durham*, 432 F. App'x 88, 97 (3d Cir. 2011).

As alleged in the Superseding Indictment, the defendant caused Sandstrom to make false statements in a letter to the FEC by withholding from Sandstrom key information about the payments from his companies to the Margolies campaign.  Those material omissions caused Sandstrom to send the letter to the FEC, which in turn dismissed the complaint on the basis of the false representations in Sandstrom's letter.  As set forth above, those representations were patently false.

## II.    Anticipated Evidentiary and Legal Issues at Trial

In order to appropriately expedite the presentation of the evidence, and also to assist the Court in addressing potential legal or evidentiary issues, the United States highlights the following topics that may arise during the course of trial.

### A.  Use of Summary Charts as Substantive Evidence

To further promote an efficient presentation of the evidence and to aid the jury in understanding the voluminous records relevant to the defendant's schemes, the United States may seek to introduce charts into evidence that accurately summarize voluminous campaign or FEC records under Federal Rule of Evidence 1006.  The Rule provides  that "[t]he proponent

may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court."   Fed. R. Evid. 1006.  With respect to the underlying records that support the summary exhibit, Rule 1006 requires the proponent to "make the originals or duplicates available for examination or copying, or both, by other parties at a reasonable time and place." *Id.*[9]  Additionally, "the court may order the proponent to produce them in court." *Id.*

Under the Rule, parties are permitted "to use charts or other exhibits to summarize voluminous materials if a summary would be helpful to the jury." *United States v. Bansal*, 663 F.3d 634, 668 (3d Cir. 2011).  The Rule's "purpose . . . is to provide a practicable means of summarizing voluminous information." *United States v. Hevener*, 382 F. Supp. 2d 719, 729 (E.D. Pa. 2005) (internal quotation marks omitted).  The district court retains broad discretion in determining whether records are sufficiently voluminous or complex to qualify for admission under Rule 1006.  *See, e.g.*, *Bansal*, 663 F.3d at 668 (3d Cir. 2011); *Pritchard v. Liggett & Myers Tobacco Co.*, 295 F.2d 292, 299 (3d Cir. 1961).  Notably, "Rule 1006 does not require that it be literally impossible to examine all the underlying records before a summary chart may be utilized, but only that in-court examination would be an inconvenience." *United States v. Onque*, 169 F. Supp. 3d 555, 574 (D.N.J. 2015) (alteration and internal quotation marks omitted), *aff'd*, 665 F. App'x 189 (3d Cir. 2016).

Once the requisite foundation is provided, a Rule 1006 summary may be admitted into evidence and go to the jury like any other admitted exhibit.  *See, e.g.*, *United States v. White*, 737 F.3d 1121, 1135 (7th Cir. 2013); *United States v. Faulkenberry*, 614 F.3d 573, 588 (6th Cir. 2010); *United States v. Janati,* 374 F.3d 263, 272–73 (4th Cir. 2004).  Because a Rule 1006 summary is

---

[9]      It bears mention, however, that Rule 1006 does not require the summary preparer to be made available to testify.  *United States v. Lynch*, 735 F. App'x 780, 786 (3d Cir. 2018).

itself evidence, no limiting or cautionary instruction is generally required.  *See, e.g.*, *United States v. Williams*, 264 F.3d 561, 575 (5th Cir. 2001) ("A summary chart that meets the requirements of Rule 1006 is itself evidence and no instruction is needed."); *United States v. Bray*, 139 F.3d 1104, 1111–12 (6th Cir. 1998) (concluding that the district court was not required to give a limiting instruction when it admitted in evidence charts under Rule 1006).[10]

As outlined above, the defendant facilitated three payments from the Brady campaign to Cavaness via VLDS and D.A. Jones and Associates, and the evidence will prove that these payments constituted unlawful campaign contributions.  A comparative review of FEC reports filed by Brady's federal campaign committees between 1998 and 2011 highlights the unusual nature of these payments in terms of sheer magnitude among the 2012 campaign expenditures, and with regard to the nature of relevant expenditures in Brady's various campaigns, in which he has never paid for a poll.

Similarly, a summary of telephone calls on a timeline would be probative and efficient in presenting communications among relevant parties without paging through irrelevant, voluminous data with the jury.

### B.  No Expert Testimony

The defendant has provided no notice of expert witnesses as required under Federal Rule of Criminal Procedure 16(b)(1)(C) following the government's repeated request for notice by letter.  The government first made its request on November 21, 2017.  The government repeated

---

[10]        In contrast to summaries under Rule 1006, a summary or chart that serves simply as a demonstrative aid or pedagogical device is not admitted into evidence and does not go to the jury.  Indeed, Rule 1006 does not apply to such demonstrative aids, which are instead governed by Rule 611.  *See, e.g.*, *United States v. Posada-Rios*, 158 F.3d 832, 869 (5th Cir. 1998) (discussing the use of demonstrative aids under Rule 611); *United States v. Blackwell*, 954 F. Supp. 944, 971 (D.N.J. 1997) (same).  At trial, the United States may use a limited number of demonstrative aids, such as timelines or other graphics, that do not necessarily summarize voluminous records, but that may assist the jury in understanding the evidence presented through witness testimony and other records.  Unlike the Rule 1006 summaries, those demonstrative aids will not be offered into evidence.  *See, e.g.*, *United States v. Anekwu*, 695 F.3d 967, 981–82 (9th Cir. 2012); *United States v. Harms*, 442 F.3d 367, 376 (5th Cir. 2006).

the request most recently on July, 2, 2018.  Neither side is expected to elicit expert testimony.  The defendant has not proffered one and neither will the government.  The government will present evidence of FEC operations through a witness with personal knowledge of those operations.  And the government will, as it routinely does in campaign finance cases, seek brief and clear instructions from the Court explaining the applicable law.  *See Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 218 (3d Cir. 2006) ("[A]n expert witness is prohibited from rendering a legal opinion.").  Accordingly, no expert testimony is necessary or appropriate in this trial as a matter of both procedure and substance.

### C.  Admission of Testimony Regarding Witnesses' Understanding

At trial, the United States anticipates eliciting from witnesses their understanding of conversations to which they were party.  Such testimony is admissible under Federal Rule of Evidence 701, which provides for the admission of lay testimony that (1) is "rationally based on the witness's own perceptions," and (2) will be "helpful to clearly understanding the witness's testimony or to determining a fact in issue."  Indeed, courts regularly uphold the admission of testimony by a participant in a conversation as to what another participant intended to convey.  *E.g.*, *United States v. LaBoy*, 505 F. App'x 182, 185 (3d Cir. 2012) (concluding that the trial court correctly allowed the witness's testimony as to "her understanding of what comments directed to her by the defendant actually meant"); *United States v. De Peri*, 778 F.2d 963, 977 (3d Cir. 1985) (explaining that Rule 701 allows for admission of a lay witness's "understanding of the use of another person's statements" (internal quotation marks omitted)); *United States v. Georgiou*, 742 F. Supp. 2d 613, 631 (E.D. Pa. 2010) (finding testimony properly admitted where the witnesses "expressed their understanding of conduct and statements which they perceived").

For example, the United States anticipates that Jimmie Moore will testify that, during an in-person meeting with the defendant, the defendant advised Moore that Moore would receive three separate payments totaling $90,000, with the first two for a poll and the last for consulting work that Carolyn Cavaness would do in the future.  Yet Moore will further testify that, based on the context of this discussion with a known operative of Robert Brady, he understood that the funds for these payments originated with the Brady campaign and that the claimed purposes of the payments were simply a cover for the Brady campaign to pay Moore's debts.  Additionally, the United States expects Donald "D.A." Jones to testify that the defendant asked him to put Cavaness on his company's payroll and indicated that the defendant needed Jones to pay her.  Jones will further testify that, although the defendant did not say why Cavaness needed to be on the payroll, Jones understood that the Brady campaign would pay Jones to pay Cavaness and understood a $25,000 check from the defendant to serve that end.  Prior to this conversation, Jones was aware that Moore had agreed to withdraw from the race in exchange for funds from the Brady campaign.

These are precisely the type of testimony that the Third Circuit and other Circuit Courts have deemed admissible under Rule 701.  *See, e.g.*, *United States v. Kozinski*, 16 F.3d 795, 809 (7th Cir. 1994); *United States v. Urlacher*, 979 F.2d 935, 939 (2d Cir. 1992); *De Peri*, 778 F.2d at 977.  So too should this Court.

III.    **Conclusion**

The United States is prepared to present this case to the jury and prove each of the charges

in the Superseding Indictment beyond a reasonable doubt.


Respectfully submitted,


WILLIAM M. McSWAIN                          ANNALOU TIROL
United States Attorney for the              Acting Chief
Eastern District of Pennsylvania            Public Integrity Section


s/_____                   s/_____
Eric L. Gibson                              Richard Pilger
Assistant United States Attorney            Director, Election Crimes Branch
                                            Rebecca Moses
                                            Trial Attorney
                                            Public Integrity Section
                                            Criminal Division
                                            U.S. Department of Justice

CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the United States' Trial Brief has been

served by Electronic Court Filing upon Brian McMonagle, Esq., counsel for defendant Kenneth

Smukler.

/s/ Eric L. Gibson
ERIC L. GIBSON
Assistant United States Attorney