**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **CRIMINAL NO.  17-00563-JD** |
| | : | |
| **KENNETH SMUKLER** | | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

Defendant Kenneth Smukler, a longtime political operative based in the Philadelphia area, and the owner-operator of several political consulting companies, including InfoVoter Technology and Black and Blue Media, stands convicted of using his skills to organize and lead two schemes by which he directed others in willfully defeating federal campaign finance limits, and  obstruction of justice in the campaign finance process administered by the Federal Election Commission ("FEC").  Smukler's crimes spanned two consecutive election cycles in two separate campaigns for the United States House of Representatives.

More specifically, the evidence at trial showed that defendant Smukler, a savvy 30-year veteran of high-stakes political campaigns, repeatedly abused his position as a trusted political consultant, to gain utterly unfair and illegal advantages for his clients, and to deprive voters and the FEC of the information that could have exposed his schemes. Further, defendant Smukler's crimes were far from aberrant:  the evidence at trial established that over and over again he hid transfers of campaign money to disguise illegal political contributions and spending, causing the falsification of records and documents inside of campaigns and at the FEC, all to influence the outcome of congressional campaigns and further his influence as a political operative. Moreover, when the FEC investigated his illegal conduct, he obstructed that federal inquiry to

maintain the illegal benefits he had obtained or provided for his clients, and to protect himself

from exposure.  Accordingly, this Court should impose a significant sentence of incarceration

within the recommended Guidelines range.  A sentence within that range will reflect the grave

seriousness of Smukler's repeated, willful violations of the nation's elections laws.

I.    **LEGAL BACKGROUND**

The Third Circuit has set forth a three-step process for sentencing by district courts

following *United States v. Booker*, 543 U.S. 220 (2005):

(1) Courts must continue to calculate a defendant's Guidelines sentence precisely as they would have before *Booker*.

(2) In doing so, they must formally rule on the motions of both parties and state on the record whether they are granting a departure and how that departure affects the Guidelines calculation, and take into account our Circuit's pre-*Booker* case law, which continues to have advisory force.

(3) Finally, they are to exercise their discretion by considering the relevant § 3553(a) factors in setting the sentence they impose regardless whether it varies from the sentence calculated under the Guidelines.

*United States v. Gunter*, 462 F.3d 237, 247 (3d Cir. 2006) (quotation marks, brackets, and

citations omitted) (citing *United States v. King*, 454 F.3d 187, 194, 196 (3d Cir.

2006)).  In calculating the guideline range, this Court must make findings pertinent to the

guideline calculation by applying the preponderance of the evidence standard, in the same

fashion as was employed prior to the *Booker* decision.  *United States v. Grier*, 475 F.3d 556 (3d

Cir. 2007) (en banc).

At the third step of the sentencing process, the Court must consider the advisory

guideline range along with all the pertinent considerations of sentencing outlined in 18 U.S.C.

§ 3553(a) in determining the final sentence.  "The record must demonstrate the trial court gave

meaningful consideration to the § 3553(a) factors. . . . [A] rote statement of the § 3553(a) factors

should not suffice if at sentencing either the defendant or the prosecution properly raises 'a ground of recognized legal merit (provided it has a factual basis)' and the court fails to address it." *United States v. Cooper*, 437 F.3d 324, 329-30 (3d Cir. 2006) (citations omitted).  *See also Rita v. United States*, 551 U.S. 338, 356 (2007) ("The sentencing judge should set forth enough to satisfy the appellate court that he has considered the parties' arguments and has a reasoned basis for exercising his own legal decision-making authority."); *United States v. Flores-Mejia*, -- F.3d --, 2014 WL 3450938, *2 (3d Cir. 2014) (en banc) ("Failure to give 'meaningful consideration' to any such argument renders a sentence procedurally unreasonable which, when appealed, generally requires a remand for resentencing.").

Here, the sentence imposed must, most importantly, promote respect for the law and deter others who would destroy confidence in the integrity of the electoral process by committing similar offenses in pursuit of elected office and political power.  *See* 18 U.S.C. § 3553(a)(2).

## II.  FACTUAL BACKGROUND

On December 3, 2018, a jury convicted defendant Smukler of nine counts in the superseding indictment.

### *Bob Brady for Congress Scheme*

In the 2012 Democratic primary election for Pennsylvania's First Congressional District, Jimmie Moore, a former Philadelphia Municipal Court Judge, ran against the incumbent, Robert Brady.  As the evidence demonstrated, and the jury found, Moore struck a *quid pro quo* deal by which he agreed to withdraw from the race in exchange for funds from the Bob Brady for Congress campaign to pay off Moore's campaign debts.  Those debts included money that Jimmie Moore for Congress (the "Moore campaign") owed to several vendors, to Moore himself, and to Carolyn Cavaness, who was Moore's campaign manager.

- 3 -

On February 29, 2012, Moore withdrew from the race.  Moore and Cavaness subsequently prepared a list of debts owed by the Moore campaign.  The evidence established that Moore provided a copy of this list to the defendant, and that the two sides agreed that the Moore campaign would receive $90,000 from the Brady campaign.  At a meeting to discuss the transfer of funds, defendant Smukler told Moore that the $90,000 would be paid in three installments: two payments from the defendant's company *disguised* as the purchase of a poll (a poll the Brady campaign already possessed)*,* and one from another Brady operative, which was *disguised* as a payment for consulting work purportedly done by Cavaness (which never occurred).

Bank records and testimony proved that three payments were made from the Brady campaign to Cavaness concealed by transfers first to the defendant then to Donald "D.A." Jones (a fellow political consultant working on the Brady campaign and who was also involved in the defendant's separate, later scheme involving the Margolies campaign described below ) in the months after Brady prevailed in the primary.  The evidence at trial established not only that the defendant met with Moore and directed the scheme, but also that he personally contacted Cavaness to arrange both the payments and the fraudulent invoicing by Cavaness for bogus work to conceal the true nature of the payments.

### i.   *First Unlawful Campaign Contribution*

The first payment was a June 11, 2012, check for $40,000 from the Brady campaign to Voter Link Data Systems ("VLDS"), a political consulting company run by the defendant.  On July 13, 2012, the Brady campaign filed an FEC report stating that this payment was an

expenditure to VLDS for "Survey and Polling Services."[1]  On June 13, 2012, two days after

receiving the money, VLDS wrote a check to Cavaness for $40,000, which she deposited in her

personal bank account.  The subject line of the check falsely stated: "Poll," though the purpose

was to pay Moore's campaign debt.  The defendant signed the check.

Records showed that Cavaness used approximately half of the $40,000 to repay Moore a

portion of the money that Moore had lent his own campaign.  Between June 18, 2012, and July 7,

2012, Cavaness wrote several checks to Moore, totaling $19,500.  Each of these checks had the

word "reimbursement" written in the subject line.  The rest of the funds from this first payment

remained in Cavaness' personal bank account, as compensation for the Moore campaign's debt

to her.

### ii.    Second Unlawful Campaign Contribution

On July 10, 2012, a month after the first payment, the Brady campaign wrote another

check to VLDS, this one for $25,000.  The Brady campaign filed an FEC report on October 15,

2012, stating that this second payment was an expenditure to VLDS for "Acquisition of Cross

Tabs," which are simply a derivative of responses in a poll readily generated from the raw data.

On July 17, 2012, one week after receiving the money from the Brady campaign, VLDS turned

around and wrote a check to Cavaness for $25,000, which she again deposited into her personal

bank account.  The defendant also signed this check.

Records and testimony established that Cavaness spent some of the VLDS money on

personal expenses for herself and Moore, in accord with the purpose of reimbursing campaign

---

1        In a legitimate transaction by a campaign acquiring a poll, the poll must be purchased from the owner because transferring a poll is a contribution to the acquiring campaign.  As a contribution, it must not come from a prohibited source (like a corporation), and must further be within the contribution limits from any legal source.  *See generally* 52 U.S.C. § 20101(8);  https://www.fec.gov/help-candidates-and-committees/winding-down-candidate-campaign/sale-campaign-assets/.

debt to them.  Cavaness also used $13,000 of that money to open a bank account for CavaSense

and Associates ("CavaSense").  Testimony showed that the defendant instructed Moore to create

a shell company to receive the Brady campaign funds.  As a result, and at Moore's direction, in

accord with instruction from the defendant, Cavaness created CavaSense in June 2012.

Cavaness later used the funds in the CavaSense account to repay campaign vendors, including

herself.  The sole purpose of CavaSense was to serve as a cut-out to receive and conceal the

Brady campaign funds funneled through the consulting companies run by the defendant and

Jones.

Smukler himself told Cavaness to create an agreement and invoices for the "sale" of a

poll to VLDS by CavaSense.  Per the defendant's instructions, Cavaness created an agreement

stating that CavaSense would sell the rights to the 2011 poll—which CavaSense did not own—to

VLDS, as well as two invoices stating that VLDS would make two payments to CavaSense:

$40,000 for the poll itself and $25,000 for the cross-tabs associated with the poll.  The jury

necessarily found that the purpose of these documents was to create a fake and concealing

justification for the transfer of funds from the Brady campaign, as discussed above.

The jury necessarily found that the defendant, working with others, sought to disguise the

first and second payments from the Brady campaign as the purchase of a poll to conceal the fact

that Brady campaign funds had been used to pay his opponent's debts.  Moore commissioned the

poll at issue a year earlier, in February 2011, to analyze the primary match between himself and

Brady.  However, witnesses and corroborating documents established that the Brady campaign

had already obtained the poll and the underlying data long before the defendant cooked up the

scheme to have the campaign supposedly purchase them from Cavaness.  In other words, that

purchase took place in June 2012, over a month after Brady won the primary, and over three

months after Moore, the opponent who was the subject of the poll, withdrew from the race. Moreover, the Brady campaign purportedly purchased this poll (which it already had), for more than twice the approximately $34,000 Moore originally paid for it in early 2011, at a time when Moore was running and the information was actually relevant.  This circumstance further established that the entire transaction was a deliberate subterfuge to conceal an illegal contribution from the defendant's client to the Moore campaign.

### iii.    Third Unlawful Campaign Contribution

The third payment from the Brady campaign came on August 23, 2012, when the campaign wrote a $25,000 check to D.A. Jones and Associates, a political consulting company run by Jones.  In its October 15, 2012 report filed with the FEC, the Brady campaign stated that this payment was an expenditure to D.A. Jones and Associates for: "Consultant."  On August 30, 2012, one week after receiving the funds, D.A. Jones and Associates sent a $25,000 check to CavaSense, with the word "consulting" in the memo line.  Jones signed this check.

Testimony at trial proved that Jones contacted Cavaness, and directed her to create an invoice stating that D.A. Jones and Associates would pay CavaSense $25,000 for consulting services.  Jones testified that the defendant directed him to make the payment to Cavaness, even though Jones knew very well that Cavaness had not done, and would never do, work justifying the payment.  Cavaness also testified that she never did any work for Jones or for the Brady campaign; rather, the purpose of the invoice was simply to further disguise the third payment.

Cavaness deposited this $25,000 check into the CavaSense account on September 4, 2012.  On that same day, she wrote checks to several vendors owed money by the Moore campaign, and she also wrote two checks to her personal account, in accord with the purpose of reimbursing campaign debt to herself.

In sum, the trial evidence established beyond a reasonable doubt that between June 2012 and August 2012, the defendant caused the Brady campaign to transfer $90,000 to Cavaness and her company for the benefit of the Moore campaign, and to satisfy its debts.  Of that amount, $21,000 was used to pay vendors owed money from the Moore campaign, and $19,500 was paid to Moore in checks labeled as "reimbursement."  Cavaness and Moore spent the remainder of the money on personal expenses.

To conceal the scheme, none of the receipts by the Moore campaign from the Brady campaign were reflected in the Moore campaign's FEC filings in October 2012 and in June 2013.  Indeed, as noted above, the Brady campaign's FEC reports reflect only the payments to the defendant and Jones, with no reference to Moore, Cavaness, or CavaSense.

The evidence at trial established that the defendant and his co-conspirators sought to disguise the fact that the Brady campaign illegally used campaign funds to pay an opponent to withdraw from a race.  In so doing, the defendant not only caused unlawful, excessive campaign contributions, but also engaged in a falsification scheme with respect to administration of matters before the FEC, namely the collection and publication of accurate information about the Moore and Brady campaigns.

### The Marjorie 2014 Scheme

Marjorie Margolies, a former Member of the United States House of Representatives, ran in the 2014 Democratic primary election for Pennsylvania's Thirteenth Congressional District. Defendant Smukler directed her campaign committee, Marjorie 2014 (the "Margolies campaign"), and he committed  multiple crimes concealing the fact that he caused the Margolies campaign to illegally spend general election funds in the primary election in his desperate, unsuccessful effort to win the primary election for his candidate.

Bank records showed that, between June 1, 2013, and April 1, 2014, the Margolies campaign paid a total of $210,750 to two of Smukler's companies: Black and Blue Media ("Black and Blue") and InfoVoter Technologies ("InfoVoter").  The campaign's FEC reports listed these expenditures for the primary election.  As discussed in more detail below, bank records show that the defendant's companies spent nearly $100,000 of the money received from the Margolies campaign on payments for goods and services for the primary campaign.

As the Court knows, federal law allows individuals to a make a contribution to a particular campaign committee, up to a designated limit for each election in a cycle, which is usually one primary and one general election.  During the primary, campaigns are allowed to accept contributions designated for the general election, so long as the general election contributions are not spent on the primary campaign.  If the candidate does not win the primary election, the campaign must refund general election contributions received during the primary.  However, if the candidate does win the primary, the campaign is free to spend the general election contributions on costs associated with the general election.

The trial evidence established that, by early April 2014, however, the Margolies campaign was running out of money that it could legally spend in the primary.  Specifically, an internal email proved that, on April 1, 2014, Smukler learned that the Margolies campaign had only $142,939 in its bank account, but had received $143,477 in contributions designated for the general election.  In other words, the campaign could not spend any more money on primary election expenses because all the money in the campaign bank account had to be set aside to refund general election contributions in case Margolies lost the primary.  This did not stop the defendant.

### iv.    First Transaction: The $78,750 Payment

As the primary campaign neared the finish line, the Margolies campaign's lack of primary election funds created an existential threat to the campaign.  The defendant and the campaign had planned to purchase television advertisements in the final weeks before the primary, but there was no money legally available to do that.  The defendant decided to fix that illegally.

Specifically, on April 29, 2014, the defendant emailed Jennifer May, Treasurer of the Margolies campaign: "I will be wiring $78,750 of the segregated media account funds into the campaign media account on may 1 . . . on may 2, will need to wire these funds out of campaign to [the company producing the advertisement], along with $65,000 from the campaign account." Testimony at trial established that the defendant sent this email after counsel for the Margolies campaign expressly advised the defendant not to make any further payments on primary election expenses using campaign funds, and emphasized that the campaign was not permitted to spend general election funds on primary election expenses.  Moreover, there was no such thing as a "segregated media account," as the defendant well knew.

Nevertheless, bank records show that on May 2, 2014, the defendant wired $78,750 from his brokerage account to Black and Blue's bank account, and, on May 5, 2014, wired the same amount from Black and Blue's bank account into a newly created bank account for the Margolies campaign.  The following day, the defendant wired $78,750 from the new campaign account to the company producing the television advertisement.  The evidence demonstrated that without the $78,750 wire from the defendant's brokerage account, Black and Blue would not have had sufficient funds to cover the $78,750 wire to the campaign account.

The defendant thus illegally injected $78,750 into the Margolies campaign to keep it

alive.  However, the defendant had no intent to absorb the cost of this crime.  On May 6, the

defendant's brother wired $75,000 to the defendant's brokerage account.  Testimony at trial

established that the defendant asked his brother, Andrew Smukler, for money specifically to

assist the Margolies campaign.  In its campaign finance report filed with the FEC on July 15,

2014, the Margolies campaign, because of the defendant's deliberately illegal actions, stated that

the $78,750 transfer from Black and Blue to the campaign account was "Refund of Media

Account."  Smukler caused May to prepare and sign this report.  May designated this payment as

a "refund" based on the defendant's representations to her.  Had she known that the $78,750

came from the defendant's brother rather than a "media account," she would not have submitted

the false report to the FEC.

> ### v.   *Second and Third Transactions: The $78,750 Payment*

Internal emails proved that, in May 2014, the defendant continued to instruct May to use

campaign funds to pay for primary election expenses, notwithstanding May's own warnings to

Smukler that the campaign had exhausted its primary funds, and that any further payments would

dip into general election funds.

On May 20, 2014, Margolies lost the primary election.  While the Margolies campaign

thus needed to refund general election contributions that it had received during the primary, the

evidence demonstrated that the campaign could not refund approximately $158,000 in general

election contributions because the campaign – at Smukler's direction - had spent nearly all of

that money illegally on primary election expenses.  In June 2014, May emailed the defendant

several times asking him whether candidate Margolies would agree to give money to the

campaign to make up this shortfall, which would have been a legal method to replenish the

general election funds needed for refunding contributors.

Smukler, however, had another illegal idea.  On July 3, 2014, he emailed May to ask "exactly what amount infovoter and blackblue need to return to the campaign to reconcile all general fund contributions."  The defendant further stated, "I intend to transfer next week thx." On July 9, 2014, May wrote to Smukler: "We need Marjorie's money in the account ASAP to get the account positive.  If it is not positive for the report due next week, we are all in really big trouble.  Please let me know when she'll be putting in the money."  Four minutes later, the defendant falsely responded: "The money will be transferred in the next couple days . . . the campaign did not spend the general money as it was escrowed in infovoter and is being refunded by infovoter to the campaign upon the demand of the campaign."  Testimony at trial confirmed that this email from the defendant was the first time May heard anything about campaign funds being "escrowed" in the defendant's companies, which the evidence further showed to be a bald-faced lie by the defendant to May.

Specifically, bank records showed that, on the same day as the email exchange with May described above, Kevin Morgan, a friend of the defendant, wired $150,000 to the defendant's brokerage account at the defendant's request.  Two days later, on July 11, 2014, the defendant wired $110,000 from his brokerage account to InfoVoter, and wired $40,000 from that account to Black and Blue.  Without the $150,000 wire from Morgan, the defendant would not have been able to fund the wires from his brokerage account to InfoVoter and Black and Blue.  The evidence also established that without the wires from the defendant's brokerage accounts, the defendant's companies would not have been able to fund their wires to the campaign account.

On July 14, 2014, the defendant wired $110,000 from InfoVoter and $40,000 from Black and Blue to the Margolies campaign's bank account.  The campaign began to refund general election contributions two days after receiving these wire transfers, which enabled the refunds

concealing the fact that the general election funds had been illegally spent to give Margolies an unfair advantage in the primary.  In a campaign finance report filed with the FEC on October 15, 2014, the Margolies campaign falsely described the $40,000 transfer from Black and Blue as "Refund of Media Account," and the $110,000 transfer from InfoVoter as "Refund."  May unwittingly signed the false report, and she testified that she made these entries based on the information provided to her by the defendant in the emails described above.

The evidence at trial demonstrated that between April 2014 and July 2014, the defendant's companies frantically and bogusly "refunded" the Margolies campaign a total of $228,750, which was $18,000 more than the campaign had paid InfoVoter and Black and Blue in the first place, and which was never truthfully a "refund" of at all.

### vi.    FEC Proceedings

In April 2014, one of Margolies' primary opponents filed a complaint with the FEC, correctly alleging that the Margolies campaign had spent general election funds on primary election expenses.  The complaint noted that the Margolies campaign's FEC reports showed that, in the first quarter of 2014, the campaign's cash on hand was less than the sum of general election contributions received.

On July 22, 2014, the defendant caused counsel for the campaign, Karl Sandstrom, to unwittingly write a false letter to the FEC arguing that the complaint should be dismissed.  That letter was based upon the defendant's lies.  In that letter, Sandstrom stated:

> The [Margolies campaign] agreed to advance a portion of [its general election] funds to its principal campaign vendors in order to secure their services, availability and commitment for the general election.  The advanced funds would be available to pay for general election media and consulting expenses of the vendors.  The funds were advanced on the condition that they would be refunded to the committee if the candidate did not secure the nomination.  The vendors accepted the funds subject to this condition and have refunded the advanced payments to the committee.

Sandstrom testified that these false representations came directly from the defendant to Sandstrom. The defendant's lies in Sandstrom's letter were consistent with the Margolies campaign's FEC reports discussed above, which also falsely described the payments from the defendant's companies as "refunds," and were also willfully caused by the defendant. Further, both witness accounts and internal emails confirmed that the defendant reviewed a draft letter from Sandstorm setting forth this false explanation before it was filed. The FEC subsequently dismissed the complaint based upon the false representations made in Sandstrom's letter communicating Smukler's lies.

The jury found that the "refund" explanation concocted by the defendant and set forth in Sandstrom's letter, as well as in the Margolies campaign's FEC reports, was entirely false. Bank records and witness testimony at trial confirmed that the defendant's companies spent nearly $100,000 of the funds received from the campaign on the primary election—that is, for goods and services provided to the campaign. The records from InfoVoter and Black and Blue show that, other than the payments to vendors for those costs, the defendant used the remainder of the funds that he received from the Margolies campaign, to pay miscellaneous expenses (like the defendant's credit card bills), or for transfers to the defendant's personal bank account or the accounts of his other companies. He did not hold the funds in any escrow, trust, segregated fund, or the like.

Because the defendant's companies had already spent at least a portion of the money they received from the campaign on the primary election, the payments from the companies to the campaign could not be "refunds" of general election expenses. In addition, as discussed above, those funds were not "escrowed," and they did not come from a "segregated media account." Instead, the defendant's payments to the campaign were funded by money he requested and

received from his brother and his friend, which he well knew were illegal and excessive campaign contributions, and which he concealed accordingly.

### vii.   Fourth Transaction: The $2,600 Conduit Contribution

On May 16, 2014, Jones received a $2,600 check from InfoVoter.  The government's evidence establishes that this check was an illegal reimbursement for a $2,600 conduit contribution that Jones made to the Margolies campaign in his wife's name, at the express direction of the defendant.  Jones testified at trial that the defendant told Jones to make that contribution and promised that Jones would be reimbursed for it.

### viii.   Fifth Transaction: The $23,750 Conduit Contribution

As discussed above, the defendant's companies frantically "refunded" the Margolies campaign $18,000 more than the companies had received from the campaign in the first place. The FEC noticed this discrepancy, and, on March 4, 2015, sent a letter to May noting that the "refunds" reported to InfoVoter on the campaign's FEC reports "exceeded the payments made to the vendor." On March 31, 2015, at the defendant's direction, May responded to the FEC by email that this error was the result of a miscommunication, and had been remedied by a payment of $18,000 from the campaign to InfoVoter.

The campaign's FEC reports showed that this $18,000 payment to InfoVoter put the campaign back in debt.  The evidence at trial further showed that to get the campaign out of debt again, the defendant illegally provided Margolies herself with money to give to the campaign.  On June 30, 2015, several months after the $18,000 payment from the Margolies campaign to InfoVoter, the defendant gave a $25,000 check from the defendant's Black and Blue account for deposit in Margolies' personal bank account.  On July 1, 2015, Margolies transferred $23,750 from her personal bank account to the campaign account.  Margolies

testified that she followed the defendant's instructions with respect to these payments, which the defendant well knew accomplished an illegal and excessive contribution by him to her campaign.

On October 15, 2015, the Margolies campaign, because of the defendant's machinations, then filed a report with the FEC falsely characterizing the $23,750 payment as a loan from Margolies to the campaign.  As of the campaign's last filing on December 31,  2017, the so-called "loan" was still outstanding.

### ix.    *Smukler's lies to the FBI*

Not content to merely fill campaign records with false statements, fill FEC reports with false statements, and obstruct the FEC, Smukler further sought to deceive the FBI during the criminal investigation as well.  As demonstrated at trial, the FBI interviewed Smukler on March 21, 2017, while the agents executed a search warrant at his residence.  In accord with the concealment described above, Smukler falsely told the FBI that Black and Blue and InfoVoter refunded money to the campaign that the companies had been "banking for the general" election.  Smukler said his companies "refunded" between $100,000 and $150,000.  Smukler said his companies "escrowed" funds for the general election, which were separate from the funds used to pay for primary expenses.

When was asked where he got the funds to make the payments to the campaign, Smukler initially denied that he had received money from any outside source.  When asked specifically about his brother, Smukler admitted—as he had to admit -- that he had taken money from his brother and a friend to fund the payments, but falsely claimed these were loans to his companies to help with various business projects.  Smukler also admitted that he used some of the campaign funds received by his companies to pay for primary election expenses.

At one point in the interview, Smukler specifically admitted that he never told Sandstrom about those payments.  Nevertheless, Smukler repeatedly told the agents that he had conferred with campaign counsel on the legality of the payments, invoking that counsel as justification for his action, though he knew he had lied to counsel.

With respect to the $25,000 payment to Margolies, Smukler initially and falsely told the agents that he did not remember the purpose of the payment.  Later in the interview, Smukler admitted that he told Margolies that they could solve the problem of the $18,000 shortfall by putting her on his payroll, and giving her the money to loan to the campaign.  Smukler admitted that he did not tell Sandstrom about the $25,000 payment.

Smukler repeated his lies to the jury that found him guilty.

The jury found that the defendant willfully caused excess contributions to the Margolies campaign, made conduit (a/k/a straw) contributions to the Margolies campaign, caused the Margolies campaign to maintain and file false reports with the FEC, made other false statements to the FEC, and obstructed an FEC proceeding.

## III.   SENTENCING CALCULATION

### A.   Statutory Maximum Sentence.

The maximum statutory sentence the Court may impose on the defendant for each of the felony counts of conviction, that is, conspiracy (Count One), excessive campaign contributions (Counts Two and Seven), false statements (Count Five), false statements scheme (Count Six), willfully causing a false statement to the FEC (Count Ten), and obstruction of justice (Count Eleven), is five years' imprisonment, a three-year period of supervised release, a $250,000 fine, and a $100 special assessment.

The maximum statutory sentence the Court may impose on Count Eight, charging

misdemeanor conduit contribution, is one year of imprisonment, one year of supervised release, a $100,000 fine, and a $50 special assessment.  18 U.S.C. § 3571(b)(4).

The maximum statutory sentence the Court may impose on Count Nine, charging conduit contribution over $10,000, is two years of imprisonment, one year of supervised release, a mandatory $50,000 fine, and a $100 special assessment.  18 U.S.C. § 3571(b)(1); 52 U.S.C. § 30109(d)(1)(D)(2).[2]

B.    **Sentencing Guidelines Calculation.**

1.    **The USSG Guideline Range**

The defendant's advisory guideline range is calculated as follows.  Pursuant to U.S.S.G. §2C1.8, the base offense level for a violation of 52 U.S.C. § 30109(d)(1)(A)(i) is 8.  The value of the illegal transactions at issue was between $250,000 and $550,000, and therefore the offense level is increased by 12 levels pursuant to U.S.S.G. §§2C1.8(b)(1) and 2B1.1(b)(1)(G).  Because Smukler occupied a position of trust in each campaign, he receives a 2-level increase.  U.S.S.G. §3B1.3.  The defendant further obstructed justice by lying at trial, warranting a 2-level increase pursuant to U.S.S.G. § 3B1.3.

2.    **The Government's Objection to the PSR Calculation**

The government respectfully submits that pursuant to the applicable sentencing guidelines, defendant Smukler's conduct warrants a further increase in the Adjusted Offense Level because Smukler had an aggravating role in the offenses for which he was convicted. Smukler's criminal activity occurred over a period of years, involved two U.S. congressional campaigns, used sophisticated means involving multiple financial institutions and transactions,

---

[2]    FECA provides a special fine provision for a two-year conduit felony offense.  A special fine provision is not authorized for a misdemeanor or five-year felony offenses.

and deployed elaborate deception techniques involving false documents.[3]   As the mastermind

behind this conduct, he was the "organizer or leader" of criminal activity that was "otherwise

extensive."[4]   Pursuant to the application of U.S.S.G. §3B1.1(a), four levels should be added to

Smukler's offense level, resulting in an Adjusted Offense level of 28.

> Application Note 4 to U.S.S.G. §3B1.1 states that:
>
> Factors the court should consider include the exercise of decision making authority, the
> nature of participation in the commission of the offense, the recruitment of accomplices,
> the claimed right to a larger share of the fruits of the crime, the degree of participation in
> planning or organizing the offense, the nature and scope of the illegal activity, and the
> degree of control and authority exercised over others.  There can, of course, be more than
> one person who qualifies as a leader or organizer of a criminal association or conspiracy.
> This adjustment does not apply to a defendant who merely suggests committing the
> offense.

Smukler both concocted and coordinated extensive, elaborate schemes with multiple

actors to violate the campaign finance laws.    In 2012, Smukler (aided and abetted by Jones,

Moore and Cavaness) caused the Brady campaign to make three contributions to the Moore

campaign in excess of the contribution limit:  the June payment of $40,000 from VLDS to

Cavaness, the July payment of $25,000 from VLDS to Cavaness, and the August payment of

$25,000 from D.A. Jones to CavaSense.  Each of these payments was secreted by the Brady

---

3 Smukler's "companies" are always lurking in the background of his schemes.  As discussed throughout this
memorandum, Smukler repeatedly used his business entities, which appear to be little more than shells, to commit
and hide campaign finance violations.  Small wonder that Smukler reported during the preparation of his PSR that
he "recalled forming Black and Blue Media in '2008, 2009, or 2010,' but has not been able to produce any business
records or tax returns showing the exact nature of this business or the income it generates."  PSR ¶ 96.
4 "In assessing whether an organization is 'otherwise extensive,' all persons involved during the course of the entire
offense are to be considered.  Thus, a fraud that involved only three participants but used the unknowing services of
many outsiders could be considered extensive."  Application Note 3, U.S.S.G. §3B1.1

campaign through an intermediary, and each of these payments was hidden with false documents.

In 2014, Smukler employed sophisticated means to commit similar sophisticated offenses in connection with a different campaign:  the 2014 congressional primary campaign of Marjorie Margolies.  Smukler funneled three unlawful contributions to the campaign—a $78,750 contribution largely funded by his brother and two contributions totaling $150,000 funded by his friend—through his political consulting companies.  Smukler also made two straw contributions to the campaign using his own money—a $23,750 contribution through the candidate and a $2,600 contribution through another political consultant.  And, Smukler caused the campaign to make false statements to the Federal Election Commission to disguise these unlawful contributions:  three false statements on campaign finance reports and a false statement in a letter to the FEC written by a lawyer for the campaign in response to a complaint filed by one of Margolies's opponents.  In 2014, he used a number of his friends, family, colleagues and subordinates – some witting and some unwitting – to both commit and hide his crimes. Throughout both election cycles, Smukler was the ringmaster.

Application Note 2 to U.S.S.G. §3B1.1 states that:

To qualify for an adjustment under this section, the defendant must have been the organizer, leader, manager or supervisor of one or more participants.  An upward departure may be warranted, however, in the case of a defendant who did not organize, lead, manage, or supervise another participant, but who nonetheless exercised management responsibility over the property, assets, or activities of a criminal organization.

Here, Smukler's managerial role in both campaigns cannot seriously be disputed, even if factual analysis were somehow limited to his own testimony at trial.

With the additional four levels, the U.S.S.G. recommended sentencing range should be 78-97 months incarceration.  At the very least, Smukler should be assessed with a 3-level

increase pursuant to §3B1.1(b) as he effectively ran both the Brady and Margolies campaigns on behalf of the candidates.[5]  As set forth more fully below, Smukler's conduct warrants a substantial term of imprisonment within the Guidelines range.

### 3.      Defense Objections to the PSR Calculation

At the outset, for the reasons set forth in this memorandum in support of its sentencing recommendation, the government objects to Smukler receiving any form of downward departure or variance.  The government has reviewed objections raised by defendant to the PSR, and responds as follows.

### The Value of the Illegal Transactions

The Probation Office has correctly calculated the 12-level increase under Sections 2C1.8(b)(1) and 2B1.1(b)(1)(G).  Notwithstanding Smukler's suggestion to the contrary, the Specific Offense Characteristic relates to "the value of the illegal transactions" and makes no mention of loss.  U.S.S.G. § 2C1.8(b)(1) (emphasis added).  The amount of loss sustained by the Margolies campaign is entirely irrelevant here.  The only loss worth mentioning here is the incalculable loss of fair primary campaigns to the citizens of Philadelphia and the opponents of Ms. Margolies.  Rather, as the evidence presented at trial clearly established, the two schemes together involved $345,100, and application of this adjustment is warranted.

### Abuse of Position of Trust

Smukler has objected to the Probation Office's determination that his guideline calculation should include a two-level adjustment for his abuse of position of trust as the director of the Margolies campaign. That objection is without merit.

---

5       In his own defense at trial, Smukler suggested that he attempted to shield both candidates from the consequences of his leadership of their respective campaigns.

Section 3B1.3 states that a two-level increase is warranted where, as here, "the defendant abused a position of public or private trust . . . in a manner that significantly facilitated the commission or concealment of the offense."   Application Note 1 further clarifies that a "position of trust" is "characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference)."  The note also states that, for the adjustment to apply, the position of trust "must have contributed in some significant way to facilitating the commission or concealment of the offense."

To say that Smukler's role on the Margolies campaign was characterized by "discretion" would be a vast understatement.  *See United States v. Hodge*, 259 F.3d 549, 556 (6th Cir. 2001) (noting that the amount of discretion is the most important factor in determining whether a defendant is in a position of trust).  Indeed, various witnesses testified unequivocally that it was Smukler who ran and controlled the campaign.  And with this essentially unchecked authority, Smukler was able not only to funnel money into the campaign and instruct subordinates like May on how to characterize the payments in FEC reports, but also to direct Karl Sandstrom to include false information in his letter to the FEC on behalf of the Margolies Campaign.

Because Smukler occupied a position of trust, and used it to commit and conceal his crimes, the Court should overrule his objection to Paragraph 60 and increase his guideline sentence by two levels.  *See United States v. Blandford*, 33 F.3d 685, 711 (6th Cir. 1994) (finding adjustment for abuse of position of trust adjustment supported where the defendant served as his own campaign treasurer); *cf. United States v. Barrett*, 178 F.3d 643, 646 (2d Cir. 1999) (noting that the adjustment has been applied to police officers, security guards, babysitters, custodians, and truck drivers).

**Defendant's Proposed USSG Calculation**

For the reasons above, the government disagrees with Smukler's position that the Adjusted Offense Level and Total Offense Level should be 16 for a mitigated role, with an applicable guideline range of 21 to 27 months.  As previously discussed, the government further disagrees with the Probation Office's determination against application of an upward role adjustment pursuant to Section 3B1.1.  Smukler's conduct warrants a four-level increase for his aggravating role in the offenses of which he was convicted, thereby resulting in an Adjusted Offense Level and Total Offense Level of 28.  The applicable sentencing guidelines range is thus 78 to 97 months' incarceration.

## IV.   18 U.S.C. § 3553(a) FACTORS

This Court must also consider all of the sentencing considerations set forth in Section 3553(a).  Those factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; (4) the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner; (5) the guidelines and policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense.  18 U.S.C. § 3553(a).[6]

---

6        Further, the "parsimony provision" of Section 3553(a) states that "[t]he court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection."

Here, the nature and seriousness of the offenses, which were carefully and deliberately calculated to corrupt two federal primary elections, and the need to promote respect for the law and afford adequate deterrence are especially weighty factors that require a significant period of incarceration.

**A.      The nature and circumstances of the offense**

A significant sentence of incarceration squarely within the Guidelines is appropriate in this case because of the nature and circumstances of Smukler's crimes, which were neither isolated nor the product of a single criminal choice.  Smukler's repeated commission of campaign finance crimes across two congressional campaigns struck serious blows to the core goal of the federal campaign finance laws:  fairness in elections conducted within universal limits and free of corrupt dealings.

While many Americans, including other campaign consultants and professionals, who desired a particular outcome to the elections knocked on doors, toiled at phone banks, or found any number of other legal ways to make their voices heard, Smukler was not content with lawful means, and sought to influence the elections on behalf of his candidates from the shadows.  He did so by orchestrating secret and illegal payments that in 2012 removed a candidate from the race by a direct *quid pro quo*, and in 2014 disadvantaged his candidate's opponents who were playing by the rules and operating within the law.  In the process, Smukler deceived the FEC and the voting public in both election cycles by hiding facts that he believed would have exposed him and had a substantial effect on the voters' preferences.

---

The Third Circuit has held that "district judges are not required by the parsimony provision to routinely state that the sentence imposed is the minimum sentence necessary to achieve the purposes set forth in § 3553(a)(2). . . . '[W]e do not think that the "not greater than necessary" language requires as a general matter that a judge, having explained why a sentence has been chosen, also explain why some lighter sentence is inadequate.'"  *United States v. Dragon*, 471 F.3d 501, 506 (3d Cir. 2006) (*quoting United States v. Navedo Concepcion*, 450 F.3d 54, 58 (1st Cir. 2006)).

It is these harms that Congress sought to prevent when it imposed contribution limits and reporting requirements.  Smukler subverted a process across two election cycles that Congress has painstakingly sought to maintain as a guarantor of integrity and fairness in federal elections. The sentence imposed should reflect the seriousness of Smukler's arrogant violations of the elections laws, and counter the public cynicism that arises when insiders like Smukler behave as though the rules do not apply to him or his candidates, or will not be enforced.  The voting public needs to know that the electoral process belongs to them, and not cynical and deliberately subversive operatives like Smukler.

The sentence should also reflect the degree of willfulness and calculation by the defendant, which place his offenses in the category most amenable to general deterrence of others weighing similar schemes.  Smukler demonstrated repeatedly that he knew exactly where the lines are drawn separating legal conduct from willful criminality, and he crossed those lines whenever it served his purposes.  As a licensed attorney[7] with over 30 years' of political experience, and a history of political contributions, he was well-aware of the election laws.  *See* PSR ¶¶ 89, 90, 92, 93.  Not only was Smukler aware of what he was doing, but he employed sophisticated means to conceal his misconduct in layer upon layer of deception.  Only a serious sentence will deter such seriously designed and executed crimes.

Worse, Smukler obstructed justice.  As the jury necessarily found, Smukler caused Margolies' campaign attorney to make false statements in a letter to the FEC by withholding from the lawyer key information about the payments from Smukler's own companies to the Margolies campaign.  That in turn caused the campaign to send the letter to the FEC, after

---

7 Defendant is currently under administrative suspension according to the Disciplinary Board of the Supreme Court of Pennsylvania.  *See* PSR ¶ 90.

review by the defendant, which in turn caused the FEC to dismiss the complaint against

Margolies campaign by her opponent on the basis of the false representations in the letter.

     **B.**    **History and characteristics of the defendant**

     Even now, a cursory examination of Smukler's PSR makes clear that the defendant is

experiencing no remorse.  *See* PSR ¶¶ 47-48.  It is well-settled that "lack of remorse is a fact that

a district court can consider in its evaluation of the § 3553(a) factors."  *United States v. Sweat*,

573 F. App'x 292, 298 (4th Cir. 2014); *see also United States v. Keskes*, 703 F.3d 1078, 1090-91

(7th Cir. 2013) ("A lack of remorse is a proper sentencing consideration 'because it speaks to

traditional penological interests such as rehabilitation (an indifferent criminal isn't ready to

reform) and deterrence (a remorseful criminal is less likely to return to his old ways).'" (citation

omitted); *United States. v Mitchell*, 681 F.3d 867, 884-85 (6th Cir. 2012 (bribery case;

distinguishing lack of remorse, where defendant persisted in denying his involvement following

jury verdict, from exercise of trial right); *United States v. Cruzado-Laureano*, 527 F.3d 231, 236-

37 (1st Cir. 2008) (rejecting argument that lack of remorse in § 3553 analysis was unfair "double

counting" where court also denied downward offense level adjustment for acceptance of

responsibility); *United States Smith*, 424 F.3d 992, 1016-17 (9th Cir. 2005) (approving district

court's above-Guidelines sentence in a tax protestor fraud case based in part on defendant's lack

of remorse).  Here, the defendant's lack of remorse is an aggravating factor that speaks poorly of

Smukler's personal characteristics and potential for rehabilitation.

     Moreover, Smukler's track record underscores his disdain for the campaign finance laws

and his contempt for the electoral process.  As an operative for former U.S. Congressman Brady,

Smukler was no stranger to controversy or attempting to flaunt the law.  Indeed, Smukler

relished his role as an accomplished political fixer, *see* PSR ¶ 100, and as reflected by the trial

testimony of Jonathan Saidel, he attempted to use his status to bully others from the 2014 race against Margolies.

Nor was this Smukler's first campaign finance violation.  Smukler worked for Brady's 2007 Democratic primary election campaign committee ("Brady mayoral campaign"). Local authorities investigated and ultimately fined the Brady mayoral campaign for violating pertinent campaign finance laws.  In fact, during the campaign, Smukler's conduct forced the Brady mayoral campaign to fire Smukler when his conduct was uncovered and reported in the press. As explained below, the lack of meaningful consequences no doubt contributed to Smukler's brazenness in 2012, and again in 2014.  A light sanction here would only compound the lenity extended to Smukler in 2007.

### Ethics Board Investigation into Brady's Mayoral Campaign

In February 2007, the Board of Ethics of the City of Philadelphia ("Ethics Board") began an investigation into contributions received and expenditures made by the Brady mayoral campaign in 2006 and 2007.[8]  This investigation ultimately uncovered eighteen violations of city campaign finance law by the campaign.  Among these violations were allegations that Brady's congressional campaign committee paid two of Smukler's consulting companies, VoterLink and Black and Blue Media, at least $20,000 for work on the Brady mayoral campaign.[9]  These payments violated the contribution limits in the Philadelphia Election Code, and the Brady mayoral campaign also failed to report the payments on its city campaign finance reports.  *See* Dkt. No. 121.

---

8    The Ethics Board is "charged with providing ethics training for all city employees and enforcing city campaign finance, financial disclosure and conflict of interest laws."  It "has the authority to render advice, investigate complaints and issue fines."  Ex. 1, ¶ A.

9    Smukler used these same business entities to commit violations alleged in the Superseding Indictment.

In March 2009, well after Brady lost the primary race, the Brady mayoral campaign admitted to these campaign finance violations (and the sixteen others) as part of a settlement with the Ethics Board.  *Id.*

### Smukler's Forced Departure from Brady's Mayoral Campaign

In late April 2007, not long after the payments discussed above, the Brady mayoral campaign fired Smukler, forcing him out after it was revealed that he coordinated the campaign's activities with a "527 group," a purportedly independent, tax-exempt organization with a political purpose.  According to federal law, 527 groups are organized for "influencing or attempting to influence the selection, nomination, election or appointment of any individual to Federal, State, or local public office."  Title 26 U.S.C. § 527 exempts such organizations from federal taxation.  In 2007, the Brady campaign fired Smukler when it became public that he had violated the state's prohibition against coordination between independent expenditures by the so-called "527" and his candidate's political campaign.  Although the Brady mayoral campaign publicly distanced itself from Smukler and his misconduct, Smukler, the candidate, and the candidate's other operatives all understood that Smukler would be able to work for Brady again in the future after the dust had settled.  Dkt. No. 121 at 3.

As a paid political consultant and experienced operative, Smukler has displayed nothing but disdain for laws designed to give the public transparency in campaign finance.  He is a political gamester with a resume littered with examples of flaunting both the contribution limits and disclosure requirements of the elections laws in his no-holds-barred, victory-at-all-costs approach to political campaigns.  Smukler repeatedly and deliberately used companies within his personal control, in the Brady mayoral campaign, in the Moore campaign, and in the Margolies campaign, to deceive regulators, political opponents, and the voting public in pursuit of electoral

victories on behalf of his clients, in pursuit of his own power and influence in politics, and in the (mistaken) belief that he could never be held accountable in a meaningful way.

The local sanctions imposed on Smukler's previous transgressions did not deter him.  The government urges the Court to impose a meaningful sanction that drives home to the defendant and others who play fast-and-loose with campaign finance laws that the federal courts will not tolerate such conduct.

C.     **The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense**.

It is difficult to overstate the seriousness of Smukler's crimes given the unique position of power and influence that Smukler exercised through his relationships with former Congressman Brady and former Congresswoman Margolies.   By his own account, Smukler exercised tremendous influence in the political arena in and around Philadelphia.  *See* generally PSR ¶¶ 93, 100.   By his conduct, Smukler abused his position and betrayed the voting public.  This Court should impose a sentence that reflects the seriousness of Smukler's willful disregard of the election and campaign finance laws.

D.     **The need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant.**

The need for the sentence to promote respect for the law and to afford adequate deterrence further supports the imposition of a significant period of incarceration.  Congress provided for strong criminal sanctions as a general deterrent to campaign finance violations. Given the magnitude and brazenness of the conduct here, the interests of deterrence are best served by imposition of a substantial term of imprisonment within the Guidelines range.

Smukler's years-long pattern of deception, and his attempts to minimize, distort, or outright hide his conduct from the FEC, the FBI, the voting public, and even his colleagues and

associates working at his direction on two congressional campaigns, make it evident that a

lengthy custodial sentence is necessary to deter him and others from future criminal misconduct

in the future.  Certainly, Smukler has no prior convictions (as opposed to his prior misconduct),

and is well-educated and professionally successful.  Generally, such characteristics suggest that a

defendant is ordinarily unlikely to re-offend in the future.  But, where, as here, the nature

multitude, and temporal span of criminal behavior betray a man whose outlook on life was often

to cheat – an outlook that succeeded for some time – his professional history and lack of prior

convictions are not a mitigating factor.  On the contrary, Smukler's education, resources, and

opportunities should weigh in favor of holding him to a more exacting standard.

For much the same reasons, the downward variance that Smukler is seeking would send

precisely the wrong message to the public.  General deterrence is a significant factor.  Campaign

finance crimes, because they are committed in secret and hidden from view, are difficult to

identify and prosecute.  Nonetheless, violations of campaign finance laws have tremendous

social costs, as they erode faith in elections and perpetuate political corruption.  Effective

deterrence of such offenses requires imprisonment that signals to the other individuals that they

cannot buy their way out of responsibility for the serious crimes proven before this Court.

Where the incidence of prosecution is lower because of the difficulty of detection, the level of

punishment must be higher to obtain the same level of deterrence.  *See generally*, Louis Kaplow

and Steven Shavell, "Fairness Versus Welfare," 114 Harv. L.Rev. 961, 1225-1303 (2001); *see*

*also United States v. Hassebrock*, 663 F.3d 9096, 922 (7th Cir. 2011) (affirming as reasonable a

within-Guidelines 32-month sentence of a tax evader when the district court explained that "a

sentence of probation would not promote respect for the law, but encourage people to flaunt it.")

Indeed, in light of the public interest in this case, the Court's sentence may indeed have a

cognizable impact on deterring future candidates and their "fixers," all of whom are sure to be

aware of the Court's sentence here, from committing future violations of the campaign finance

laws.

> **E.**    **The guidelines and policy statements issued by the Sentencing Commission and the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner**.

The government is aware of no training needs, vocational or otherwise, by Smukler.  Nor

is the government aware of any Guideline policy statements that call for a downward variance

here based upon needs for educational or vocational training, or medical care.  *See* PSR ¶¶ 83-90.

> **F.**    **The need to avoid unwarranted sentence disparities.**

The most equitable way to ensure that the defendant's sentence is arrived at by a fair and

objective calculation is by imposing a sentence within the guideline range.  While the sentencing

guidelines are advisory, they remain the sole means available for assuring some measure of

uniformity in sentencing, fulfilling a key Congressional goal in adopting the Sentencing Reform

Act of 1984.   Referring to the guidelines while carefully considering the § 3553(a) factors

particularly relevant to an individual defendant is the only available means of preventing the

disfavored result of basing sentences on the luck of the draw in judicial assignments.  The Third

Circuit explained:

> Even under the current advisory system, district courts must "meaningfully consider" § 3553(a)(4), i.e., "the applicable category of offense . . . as set forth in the guidelines." The section of Booker that makes the Guidelines advisory explains that "the remaining system, while not the system Congress enacted, nonetheless continue[s] to move sentencing in Congress' preferred direction, helping to avoid excessive sentencing disparities while maintaining flexibility sufficient to individualize sentences where necessary." *Booker*, 543 U.S. at 264-65 (emphasis added).  The Guidelines remain at the center of this effort to "avoid excessive sentencing disparities," and, as the *Booker* Court explained, the Sentencing Commission will continue "to promote uniformity in the sentencing process through the Guidelines.  *Id*. at 263.  We have likewise observed that the "'Guidelines remain an essential tool in creating a fair and uniform sentencing regime

across the country.'" *Coope*r, 437 F.3d at 331 (*quoting United States v. Mykytiuk*, 415 F.3d 606, 608 (7th Cir. 2005)).

*United States v. Ricks*, 494 F.3d 394, 400 (3d Cir. 2007) (emphasis in original).  The best way to avoid sentencing disparity in this case is to consider a sentence within the advisory guideline range and then sentence Smukler accordingly.  As the United States District Judge observed when pronouncing sentence upon Jay Odom in the Middle District of Florida after his guilty plea to or violating 18 U.S.C. § 1001:

> The offense … goes to the very heart of our democratic system. If we cannot have faith and confidence in our election process, then we can't exist as a democracy.
>
> So it is a direct attack on the very basics of our system and is difficult. I'm disappointed to understand -- not that you, but others in writing on your behalf talked about how they didn't think there was anything wrong with it, that everybody does it, it's just one of those things that's part of the system.
>
> Well, I hope and pray that that is not the case, but it's necessary, of course, that this be dealt with considering the seriousness of the offense as well as that misunderstanding on behalf of apparently so very many people that it is in fact just a mistake that's done all the time with no consequences as a result.
>
> Well, the consequences, I'm sure, cannot be necessarily identified in every case or defined, but clearly it violates the system that we all cherish and respond to.

*United States v. Odom*, 3:12-cr-00076, Sentencing Tr., 2-3 (N.D. Fla. April 23, 2013)(imposing a term of six months imprisonment and a $46,000 fine upon a guilty plea to *one count* of causing false statements to the FEC under Section 1001).  *See also United States v. Bigica*, 543 F. App'x 239 (3d Cir. 2013) (60 months imprisonment after guilty plea for tax evasion and conduit contribution conspiracy).

Therefore, in sum, all of the appropriate considerations of sentencing favor a sentence that includes a lengthy period of incarceration within recommended advisory range.  The Supreme Court has declared:  "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark."  *Gall v.*

*United States*, 552 U.S. 38, 49 (2007). "These requirements mean that '[i]n the usual sentencing, … the judge will use the Guidelines range as the starting point in the analysis and impose a sentence within the range." *Peugh v. United States*, 133 S. Ct. 2072, 2083 (2013) (quoting *Freeman v. United States*, 131 S. Ct. 2685, 2692 (2011) (plurality opinion); ellipsis in original). "Common sense indicates that in general, this system will steer district courts to more within-Guidelines sentences." *Peugh*, 133 S. Ct. at 2084. "The federal system adopts procedural measures intended to make the Guidelines the lodestone of sentencing." *Id.*

## V.   RESTITUTION

The government is unaware of any restitution obligation on the part of the defendant.

## VI.    GOVERNMENT'S RECOMMENDATION

After considering the factors of 18 U.S.C. § 3553(a), the government recommends a significant sentence of imprisonment within the applicable sentencing Guidelines range. Criminal FECA violations are an assault upon our democratic and electoral processes, and therefore warrant significant penalties. Across the country, criminal violations of the election laws have resulted in significant penalties for the offenders for that very reason. The serious nature of Smukler's criminal conduct warrants a substantial sentence of incarceration within the applicable guidelines range. Moreover, the defendant's significant personal wealth as detailed in the PSR, enables to him to pay the substantial fine that he should receive as a further lesson to him and others that these crimes, furthering careers in the lucrative profession of political consulting, will not be allowed to pay.

Respectfully submitted,

WILLIAM M. McSWAIN
United States Attorney for the
Eastern District of Pennsylvania

s/ *Eric L. Gibson*
Eric L. Gibson
Assistant United States Attorney

ANNALOU TIROL
Acting Chief
Public Integrity Section

s/  *Richard Pilger*
Richard Pilger
Director, Election Crimes Branch
Rebecca Moses
Trial Attorney
Public Integrity Section
Criminal Division
U.S. Department of Justice

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this Sentencing Memorandum has been served electronically on the counsel of record:

Brian J. McMonagle, Esquire
MCMONAGLE, PERRI, MCHUGH & MISCHAK, P.C.
1845 Walnut Street, Floor 19
Philadelphia, PA 19103
Phone: (215) 981-0999
Fax: (215) 981-0977

*/s Eric L. Gibson*
ERIC L. GIBSON
Assistant United States Attorney

DATED:  April 26, 2019